James LEO

v.

AMERICAN HOIST & DERRICK
COMPANY

and

National Union Fire Insurance Company.

Supreme Judicial Court of Maine.

Argued June 12, 1981.

Reargued Nov. 13, 1981.

Decided Dec. 31, 1981.

Joseph L. Bornstein, Kenneth W. Hovermale, Jr. (orally), Portland, for plaintiff.

Preti, Flaherty & Beliveau, Keith A. Powers (orally), Portland, for defendant.

Before McKUSICK, C. J., GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ., and DUFRESNE, A. R. J.

CARTER, Justice.

American Hoist and Derrick Company (American Hoist), the employer, and James Leo, the employee, both appeal from a pro forma decree of the Superior Court (Cumberland County) affirming the decision of the Workers' Compensation Commission. The Commission terminated compensation on the employer's petition for review of incapacity but ordered partial compensation from the time of the employee's return to work until the date of the decree.

James Leo worked as a drop forge hammerman at American Hoist. This job required lifting weights of up to 150 pounds

and holding bars of steel for long periods of time. On February 28, 1979, Leo sustained a right thumb injury which arose out of and in the course of his employment with American Hoist. He had previously injured the same thumb while wrestling. By agreement between the parties, the employee received compensation of $244.99 per week for total incapacity based on his average weekly wage from American Hoist of $361.85. Following his discharge from American Hoist in March, 1979 for reasons unrelated to his injury, Leo was out of work until he was employed by Yarmouth Paint Company as a floor manager in September, 1979. This job entailed some lifting and climbing but was primarily clerical, and paid $175 a week, raised to $200 after April 3, 1980.

On July 11, 1979, American Hoist petitioned for review of incapacity and on September 10, 1979, filed a "Certificate Required Before Suspension of Compensation For Review of Incapacity." American Hoist suspended payments on the ground that Leo had resumed work. Leo countered with a "Petition For Resumption of Payment of Compensation" which he contends was filed pursuant to 39 M.R.S.A. § 104–A. That petition noted, *inter alia*, that the agreement for compensation did not take into account wages earned by Leo at the part-time job he held with Sears, Roebuck and Company while working at American Hoist.

By agreement of the parties, both petitions were consolidated for hearing. The evidence of record includes: the testimony of the employee, medical progress notes and the deposition of Dr. Jean Labelle, medical reports of Drs. Donald Allen and Paul Feldon and a Wage Statement from Sears, Roebuck and Company. The Commissioner's decision of September 24, 1980 found that Leo no longer had any work disability and terminated benefits from the date of the decree. Finding that American Hoist's suspension of payments was based on Leo's employment at Yarmouth Paint Co., the Commissioner granted Leo's petition for re-

sumption of payment to the extent of $124.57 per week from the time he began work at Yarmouth Paint Co. to April 3, 1980 and $107.90 per week from April 3, 1980 to the date of the decree.

On October 6, 1980, Leo requested findings of fact and conclusions of law. The Commissioner evidently responded to this request by ordering the parties to submit proposed findings. American Hoist viewed the decree as "sufficiently detailed to obviate the necessity of any proposed findings" and did not submit any proposed findings. Leo replied to the Commissioner's request a month after the order by stating that he was standing on his memorandum of law filed in May, 1980. Finding this reply unsatisfactory, the Commissioner denied Leo's request for findings of fact and conclusions of law.

Four questions are raised on appeal. These concern: (1) the propriety of the Commissioner's consideration of the conflicting medical evidence concerning Leo's disability; (2) the employer's right to suspend payments; (3) the Commissioner's authority to alter an agreed upon amount of pre-injury wages in light of new evidence and (4) the Commissioner's power to deny requests for findings of fact and conclusions of law.

## I. *Medical Evidence*

Leo asserts that the Commissioner's finding as to the degree of incapacity was error as a matter of law because the Commissioner relied only on the report of Dr. Allen and ignored or disregarded other competent medical testimony in reaching his conclusion concerning the extent of the disability. While the Commissioner's findings on this matter are brief,[1] we are not convinced that the Commissioner improperly evaluated the medical testimony presented to him.

The extent of a worker's incapacity is a question of fact. *Madore v. Bangor Roof & Sheet Metal Co.*, Me., 428 A.2d 1184, 1188 (1981). In carrying out his responsibility as fact finder, the Commissioner must weigh competing evidence and is not re-

1. For the findings of the Commissioner with respect to the medical evidence see footnote 2.

quired to accept or reject the whole testimony of particular medical experts. *Gordon v. Aetna Casualty & Surety Co.*, Me., 406 A.2d 617, 619 (1979); *Bradbury v. General Foods Corporation*, Me., 218 A.2d 673, 674 (1966).

In the instant matter, the Commissioner reviewed evidence from three different physicians regarding Leo's condition. Dr. Labelle, the treating physician, indicated in his deposition that as of July 18, 1979, Leo was capable of doing light work. Light work in this case included work heavier than the type Leo performed at Yarmouth Paint Company but not of the type required of a drop forge operator. At the December, 1979 deposition, Labelle also testified that Leo was still incapable of performing the latter duties. On cross-examination, Labelle said that Leo's work-related thumb injury "procrastinated" Leo's earlier light thumb injury and that the prior injury also restricted his ability to "heavy grasp" or pinch.

The report of Dr. Feldon from an examination in March, 1980, estimated the functional loss of the right hand at five percent based on the limitation of the thumb motion and loss of pinch strength. The loss of grip strength was viewed as excessive and not substantiated by the other clinical findings.

Dr. Allen, in his report on an examination of Leo in July, 1979, stated that he had received and reviewed medical reports including those of Dr. Labelle forwarded to him by the insurance adjuster. Allen, in his addendum to the original report, stated that Leo could return to light work following the examination and to full duty status without limitation four weeks thereafter. Allen also indicated, as did Labelle, that exercise and usage of the thumb would serve to increase its strength.

■ In light of this evidence, the Commissioner's finding that Leo was no longer disabled as of the date of the decree is supported by competent evidence. Moreover, it is far from clear that the Commissioner ignored evidence other than that presented in Dr. Allen's report. The Commissioner noted the other reports and the deposition in his recital of the evidence. He also commented generally that the evidence indicated a minimal residual injury; this conclusion is consistent not only with Allen's report but also with the report of Dr. Feldon. The Commissioner need not recite and analyze in minute detail all the medical evidence of record to explain the evidentiary basis of his decision. *See Parent v. Great Northern Paper Co.*, Me., 424 A.2d 1099, 1101 (1981). We find no basis to believe that the Commissioner improperly disregarded competent and probative evidence in reaching his decision; the language of the decree is consistent with his finding Dr. Allen's report the most persuasive.

■ Leo's contention that the record lacked the required comparative evidence is equally deficient. The requirement of comparative medical evidence can be satisfied in certain instances when an examining physician acquaints himself with the worker's prior condition by review of medical reports made by other physicians. *Van Horn v. Hillcrest Foods, Inc.*, Me., 392 A.2d 52, 54–55 (1978). Moreover, the need for such evidence may not be required when, in a review of incapacity, it is determined that the claimant no longer has any physical disability. *Curtis v. Bridge Construction Corp.*, Me., 428 A.2d 62, 64 (1981). In light of Dr. Allen's use in his report of Dr. Labelle's medical records and the Commissioner's characterization of Leo's current condition, there is adequate evidence to support the Commissioner's finding.

## II. *Suspension of Benefits*

American Hoist contends, on its appeal, that the Commissioner incorrectly awarded *partial* benefits to Leo *for the period between the date of re-employment and the issuance of the decree.* The basis of this contention is that since Leo has "resumed work" the suspension of benefits was proper and because the Commissioner ultimately found that Leo had no incapacity, the retroactive award of partial compensation was erroneous. As a subsidiary proposition of

law, the employer contends that the propriety of the suspension under 39 M.R.S.A. § 100 (repealed and replaced by P.L.1981, c. 514, § 4, effective September 18, 1981) is not affected by a subsequent determination by the Commissioner, on petition for review, that the employee was partially disabled *at the time of the suspension.*

The employer's position is that a suspension is improper once the employee has in fact returned tc work only if the suspending employer fails to comply with the procedural requirements specified in § 100; that is, the filing by the employer of a Petition for Review and the filing of the required Certificate that the employee has returned to work. Once these requirements are met, the employer asserts that it is liable from the date of suspension only for that level of benefits resulting from the Commissioner's ultimate determination of the employee's level of disability on the then pending Petition for Review. Thus, it is contended that the Commissioner erred in awarding partial benefits because of the Commissioner's determination that *as of the date of the decree* Leo had regained full work capacity.[2]

We therefore must determine whether the propriety of the suspension in this case is to be measured solely by the employer's compliance with the procedural requirements of § 100 or is dependent upon the Commission's determination of the employee's work capacity at the time of the suspension. Section 100 allows an employer to unilaterally suspend payments upon the proper filing of a certificate that certifies that the employee has resumed work. The statute is not explicit with respect to whether the employee must be working at his original pre-injury position or simply be gainfully employed in order for the provisions of § 100 to be applicable. The objective of the Workers' Compensation Act, however, is clear; its underlying purpose is to provide compensation for loss of earning capacity from actual or legally presumed incapacity. *Levesque v. Shorey,* Me., 286 A.2d 606, 609 (1972); *Waltz v. Boston & Rockland Transportation Co.,* 161 Me. 359, 363, 212 A.2d 431 (1965). When an employee no longer suffers from a loss of earning capacity but simply chooses to work at a different and, perhaps, lower paying job, the purpose of the Act is not fulfilled by continued compensation. Thus, we see no reason to limit the effect of § 100 to only

---

2. Some interpretation of the Commissioner's decree is required. The decree states in that part pertinent to the Commissioner's assessment of Leo's level of disability:

The evidence indicates that this employee has a minimal residual to his right thumb resulting from the injury in question. Donald E. Allen M.D., a noted plastic and hand surgeon, indicates as a result of a question from the attorney for the employee that in his opinion the employee could return to work without limitation in approximately October of 1979. Based on the evidence therefore I find as a fact that any residuals that the employee presently has resulting from his injury of February 28, 1979 are no longer disabling in a work sense. Accordingly, the [employer's] Petition for Review of Incapacity is hereby granted.

Having thus so found the legal—procedural issue becomes what consideration this Commission should give to the fact that the employer suspended benefits by a Certificate of September 10, 1979 and the employee had petitioned for a Resumption of these benefits. *The Law is clear that had no such certificate of suspension been filed this Decree could not have had the effect of suspending bene-*

*fits prior to the date of this Decree. Thus, had that been the case, this Decree would have ordered that the benefits presently being paid the employee would have been terminated as of the date of this Decree.* The evidence is clear however that the reason that the employer suspended benefits was not because the employee had returned to work at his old job at his old rate of pay but rather that the employee had on September 4, 1979, gone to work at the Yarmouth Paint Company at a salary of $175.00 per week which as of April 3, 1980 was increased to $200.00 per week. By the agreement between the parties the employee's average weekly wage at the time of the injury in question was $361.85.

(Emphasis added.) We think it clear that the Commission found (1) that Leo had a disability of approximately 50% at the time of the suspension on September 4, 1979 and (2) that Leo's disability ceased entirely sometime thereafter, but that he was entitled to continued benefits because of an improper suspension. A review of the record shows both of these unexpressed findings of fact to be properly supported by evidence.

those instances where the employee has returned to his pre-injury employment.

We are cognizant, however, of the potential for misconception by the employer of the degree of incapacity of an employee, when an employee returns to the work force but at a different wage level or position. The employer must recognize that, as a practical matter, the resumption of work at a different, lower paying position does not necessarily signal a return to full, pre-injury capacity. *See e.g., Fecteau v. Rich Vale Construction, Inc.*, Me., 349 A.2d 162 (1975). Since the employer has the power to suspend or decrease payments when the employee has resumed work, he must also bear the responsibility to determine, before doing so, that the return to the work force at any job other than his pre-injury position is the result of a voluntary choice on the part of the employee and is not related to a limitation imposed by continued partial incapacity.

Accordingly, the employer is obligated to ascertain by investigation or other appropriate means, whether the employee's job choice is a voluntary election on his part or is dictated by some continuing level of incapacity. Such investigation should usually include interviews with the former employee and the employee's current employer and a medical examination. Where, following such investigation, the employer determines that the resumption of work indicates a return to full capacity, it may suspend payments. The propriety of such a suspension is, however, dependent upon the Commissioner's ultimate determination as to the employee's work capacity at the time of the suspension.

If the employer chooses to take advantage of the *suspension* procedures without any investigation of the employee's actual work capacity and without any attempt to reach a discrete judgment as to the level of that capacity, a subsequent finding by the Commissioner *of any degree of incapacity* at the time of the suspension will render the suspension improper. This is that case. Since an improper suspension does not obviate the employer's responsibility to make payments until a decree or approved agreement modifies the prior obligation, the employer remains liable to the employee for the full amount of payments being paid prior to the suspension under the approved agreement or decree. *See Dailey v. Pinecap, Inc.*, Me., 321 A.2d 492, 493 (1974); *Waltz v. Boston & Rockland Transportation Co.*, 161 Me. 359, 212 A.2d 431 (1965). Thus, a suspension without inquiry into actual work capacity is the most risky remedial course to be taken by an employer where that employee has returned to work since a subsequent finding of *any* disability at the time it occurs will render it an improper suspension.[3]

We think the fact that section 100 provides for a decrease in compensation in addition to a suspension of compensation, where the employee returns to work, indicates a clear legislative contemplation that any adjustment in compensation on the basis of the return to work be keyed, as to amount, to the employee's work capacity as reflected by the new employment, and that a *return to work per se* does not justify a suspension of the employee's benefits. The statute authorizes the employer to act unilaterally, without the safeguard of immediate oversight by the Commissioner. Because of that circumstance, it must follow that the statute contemplates that the employer shall implement such a suspension of or decrease in compensation only if it is consistent with a reasonable and good-faith judgment as to the extent of *any reduction* in the employee's work *incapacity*, as reflected by the circumstances of the reemployment and other evidence relevant to that question developed by the employer's investigation. To the extent that the em-

---

3. The employer has other alternative courses of action which place it less at risk. For example, the employer may seek to enter into a new compensation agreement with the employee which reflects the change in capacity indicated by the results of investigation; *see* 39 M.R.S.A. §§ 94 and 100. Additionally, the employer may have resort to the procedures specified in § 100 for a decrease in compensation based upon the results of the employer's investigation of the circumstances of the new employment and the employee's actual work capacity.

ployer implements a suspension of, or a reduction in, benefits after fair investigation and on the basis of a good-faith and reasonable assessment of the employee's actual level of work capacity, taking into account his reemployment, such action will not be rendered improper because the Commissioner may subsequently assess the employee's work capacity differently in the ultimate ruling on the Petition for Review.

 In the instant matter, the Commissioner awarded Leo partial benefits during the period of suspension. Compensation at the level established as of the date of the suspension by an approved agreement or a decree is the proper remedy when an employer's suspension of benefits is improper. Thus, on this record, Leo was entitled to receive compensation benefits at the previously established weekly rate of $244.99 for the period from the date of the improper suspension, September 4, 1979, to the date of the decree, September 24, 1980. Here, however, the employee filed a Petition seeking resumption of benefits in which he sought only restoration of *partial* benefits. The Prayer for Relief of that Petition states:

> WHEREFOR[E] the Employee prays that this Honorable Commission order the resumption of payment of compensation *at a partial compensation rate* pending the decision on the Petition for Review of Incapacity.

(Emphasis added.) By this pleading, the employee can only be taken to seek partial compensation at a rate adjusted for his earnings in the new employment as of September 4, 1979. He obviously did not seek resumption of benefits at the level of compensation established prior to the suspension since that was set by the approved Agreement which recites that the level of benefits there established is for "total incapacity to work."

Therefore, the employee elected to seek only partial compensation and was given by the Commission exactly what he sought.[4] In this circumstance, the employee cannot be heard to complain that the Commission erred in awarding only partial compensation from April 3, 1980 (the date the Commission found full recovery of work capacity), to the date of the decree as a consequence of the improper suspension. The employee was given by the Commissioner all that he sought.

### III. *Authority to Alter Agreed Upon Pre-Injury Wages*

 Leo argues that the Commissioner erred in his calculation of the average weekly wage by failing to consider wages earned by Leo at his employment with Sears, Roebuck and Company. Leo was employed at Sears during the same period of time he worked at American Hoist. The claim of error rests on the argument that these wages should be included in computing Leo's average pre-injury weekly wage because they were not included in the original agreement between the parties and thus the amount specified in the agreement does not accurately reflect Leo's pre-injury earning capacity. While we agree that wages earned in the course of concurrent employment may be relevant in ascertaining an employee's pre-injury earning capacity, we do not believe the Commissioner erred in failing to consider this evidence when only a petition for review of incapacity was pending.

 Leo rests his argument on the language of paragraph two of 39 M.R.S.A. § 100 (repealed and replaced by P.L.1981, c. 514, § 4, effective September 18, 1981) which provides in part:

> Upon such review the commissioner may increase, diminish or discontinue such compensation or vocational rehabilitation in accordance with the facts, as the justice of the case may require.

---

4. The pertinent part of the decree reads:
 Employee's Petition for Resumption of Payment of Compensation is hereby granted to the extent that the employer is hereby ordered to pay the employee compensation at a rate of $124.57 per week from September 4, 1979 to April 3, 1980 and compensation based on a rate of $107.90 per week from April 3, 1980 to the date of this Decree.

Read in a vacuum, this language might support Leo's contention that the Commissioner is empowered to fully review all aspects of a compensation agreement when presented with a petition for review.

However, the language of the first paragraph of § 100 must be examined in order to ascertain the full meaning of the language relied upon by Leo. The first paragraph of § 100 provides in part:

> While compensation is being paid ... under any agreement, award or decree, the *incapacity of the injured employee due to the injury* ... may from time to time be reviewed by a single commissioner upon the petition of either party upon the grounds that *such incapacity* has *subsequently increased, diminished or ended*
> . . . .

(Emphasis added.) The clear import of this language indicates that a petition for review of incapacity merely focuses on whether the degree of incapacity of the employee has changed.

> A petition for review of incapacity addresses itself to *change of circumstances* since the time of the earlier determination, by commission decree or by agreement of the parties approved by the commission, of the employee's disability and the causal connection of that disability to a work incident.... Only changes in circumstances of disability or causation occurring *after* the decree or agreement count in support of making a change in compensation payments.

*Dufault v. Midland-Ross of Canada, Ltd.,* Me., 380 A.2d 200, 203–04 (1977) (emphasis in original); *see Wilcox v. Stauffer Chemical Corp.,* Me., 423 A.2d 241, 243 (1980); *Mortimer v. Harry C. Crooker & Sons, Inc.,* Me., 404 A.2d 228, 230–31 (1979). Thus, a review of incapacity is only a device for either an employee or employer to ask the Commissioner to determine whether the incapacity of the injured employee has changed since the date of the agreement; it

is not the vehicle for collaterally attacking other aspects of a decree or agreement.[5]

This restricted scope of review serves to " 'insure that a petition for review of incapacity can never serve as a tool for prying open matters already settled.' " *Hafford v. Kelly,* Me., 421 A.2d 51, 53 (1980), *quoting Nelson v. Town of East Millinocket,* Me., 402 A.2d 466, 468 (1979). The underlying purpose of such a rule is to establish once and for all matters pertaining to the approved agreement; only changes in the level of disability occurring after the agreement can weigh towards a change in a level of compensation.

This limitation on the scope of petition for review of incapacity is not unjust in light of the possible remedy available to Leo under 39 M.R.S.A. § 102. That section permits an employee to petition the Commissioner to annul an agreement provided such an "agreement was entered into through mistake of fact by said petitioner or through fraud." Upon annulment, the employee is "free to pursue whatever remedies are available to him in absence of a binding agreement." *St. Pierre v. St. Regis Paper Co.,* Me., 386 A.2d 714, 720 (1978).

We have observed that a mistake on the part of the employee causally connected to the agreement and regarding wages earned from a second job could, under certain circumstances, provide grounds for annulment of an approved compensation agreement. *Cannon v. Folsom,* Me., 401 A.2d 997, 1000 (1979). Leo's petition for resumption of compensation payments did not bring this matter into issue at the review of incapacity proceedings. The agreement was not a part of the record; the circumstances surrounding the signing of the agreement were not presented at either of the two hearings. Moreover, the petition for resumption of payments only made mention that the possibility of underpayment existed and the parties were in the

---

5. We note that in *Bernard v. Cives Corp.,* Me., 395 A.2d 1141 (1978), the Court upheld the Commissioner's increase in the rate of compensation in a hearing on a review of incapacity.

That case, however, did not deal with a change in the employee's average weekly wage but rather with a statutory change affecting the rate ceiling of compensation.

process of resolving the error. The mere introduction of a wage statement into evidence is clearly insufficient to bring mistake of fact into issue particularly when § 102 clearly contemplates initiation of such a proceeding by petition.[6] Accordingly, we conclude the Commissioner did not err by not altering the previously agreed upon wage amount.

## IV. *Failure to Make Findings of Fact and Conclusions of Law*

Leo's final contention addresses the Commissioner's denial of his request for findings of fact and conclusions of law. The Commissioner denied Leo's request after Leo complied with an order to submit proposed findings by sending a letter to the Commissioner that stated that Leo stood on the facts of his previously submitted memorandum of law. The letter was sent more than a month after the order for proposed findings was issued; the memorandum had been submitted to the Commissioner four months prior to the rendering of the Commissioner's decree. Despite Leo's slow and possibly ineffective efforts to comply with the order, he asserts that the Commissioner erred in denying his request.

■ Title 39 M.R.S.A. § 99 places an affirmative duty upon the Commissioner to make findings of fact and conclusions of law when requested by the parties. The purpose of these findings is to provide an adequate foundation for an appellate court "to determine whether competent evidence supports the commission's decision and whether its decree is based either upon a misapprehension of fact or a misapplication of law to facts." *Dufault v. Midland-Ross of Canada, Ltd.*, Me., 380 A.2d 200, 203 (1977).

■ We have ruled that where such a request is made, the Commissioner "should permit or even require counsel, particularly counsel for the prevailing party, to submit proposed findings for him to consider. . . . Only thus can the Commissioner obtain the full benefit of the adversary system in carrying out the responsibilities imposed upon him by section 99." *Coty v. Town of Millinocket*, Me., 423 A.2d 524, 527 (1980). Proposed findings submitted by counsel, however, should never be considered as more than suggestions for the assistance of the Commissioner. *See* 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2578 (1971) (discussing proposed findings under F.R.Civ.P. 52). They should not be used to supplant the Commissioner's own independent analysis, judgment and determination of the facts and law at issue. Similarly, counsel should not view the submission of proposed findings as an opportunity to relitigate the case. In short, the proposals serve as an aid to the Commissioner in carrying out his responsibility to find facts and apply the law.

■ Counsel's failure to submit proposed findings as ordered by the Commissioner does not, under all circumstances, obviate the duty of the Commissioner to carry out his responsibilities under § 99. A failure on the part of the Commissioner to make findings will usually compel this Court to remand the case to the Commissioner with an order that he comply with the mandate of that section. *Gallant v. Boise Cascade Paper Group*, Me., 427 A.2d 976, 977 (1981). In some instances, however, an attorney's failure to comply with the Commissioner's order may justify a denial of his request for findings, *id.* at 977 (remand where Commissioner's failure to make findings is *wrongful*) or permit the

---

**6.** The distinction between a petition for review of incapacity and a petition for annulment is further illustrated by a prior version of 39 M.R.S.A. § 2(3). Until 1975, petitions to annul were heard by two or more commissioners while a review of incapacity could be referred to a single commissioner. *See* 39 M.R.S.A. § 2,

Historical Note at 647 (1978). This difference in procedures serves to highlight the different issues involved in each proceeding.

While the current version of § 2(3) might be interpreted as eliminating the procedural differences in these proceedings, we intimate no

Commissioner to view the request for findings as withdrawn.[7]

While we do not have a sufficient factual record before us to determine whether the Commissioner's denial of the request was proper, the record is sufficiently adequate to enable us to carry out our review function thereby allowing us to resolve the issues at bar without remanding for further findings of fact. With respect to the questions on the propriety of the suspension of payments and the alteration of the pre-injury wage amount, our result is compelled as a matter of law. Remand for further findings of fact or conclusions of law would therefore not be justified in regard to these issues. *Cf. Ibbitson v. Sheridan Corp.*, Me., 422 A.2d 1005, 1011–12 (1980) (even if Commissioner applied incorrect burden of proof, under correct standard facts compel same finding as a matter of law).

On the issue of the sufficiency of the medical evidence, the decree permits us to easily ascertain the basis of the Commissioner's decision. Pending before the Commissioner was a petition for review of incapacity; the Commissioner noted that the presented medical testimony indicated that Leo was no longer disabled and thus terminated benefits. Since there is competent evidence to support such a finding of Leo's return to work capacity, we need not assume facts or legal theories to support the Commissioner's ultimate conclusion that benefits be terminated. Since the foundation exists to evaluate the Commissioner's decree, we see no reason to delay further, by a remand for further findings, the resolution of this dispute. *Compare Cook v. Bangor Hydro-Electric Co.*, Me., 402 A.2d 64 (1979) and *Landry v. Great Northern Paper Co.*, Me., 383 A.2d 655 (1978) *with Gallant v. Boise Cascade Paper Group*, 427 A.2d at 977–78.

The entry is:

Judgment affirmed.

It is further ordered that the employer pay to the employee an allowance for his counsel fees in the amount of $550.00, plus his reasonable out-of-pocket expenses for this appeal.

All concurring.

---

opinion as to the effect of this change in the statutory language.

**7.** We note that sanctions other than a denial of the request for findings may be available for disciplining an attorney who fails to comply with an order to submit proposed findings. Title 39 M.R.S.A. § 93(5) permits the Commissioner to serve upon a person disobeying a lawful order an order requiring that person to appear before the Superior Court to show cause why he should not be adjudged in contempt. Failure to follow a court order may also raise questions as to violation of provisions of the Code of Professional Responsibility. M.Bar.R. 3.2(f)(4) (a lawyer shall not engage in conduct prejudicial to the administration of justice); *see also* 4 M.R.S.A. § 851. We in no way pre-determine what type of conduct justifies the sanctions permitted under these provisions.