**Wayne ASHBY**

v.

**RUST ENGINEERING CO., et al.**

**Stephen GURNEY**

v.

**RUST ENGINEERING CO., et al.**

Supreme Judicial Court of Maine.

Argued May 12, 1989.

Decided May 31, 1989.

James J. MacAdam (orally), Maurice A. Libner (orally), McTeague, Higbee, Libner, Reitman, MacAdam & Case, Topsham, for the employees.

Frederick H. Greene, III (orally), Richard VanAntwerp (orally), Robinson, Kriger, McCallum & Greene, Portland, for the employers.

Before ROBERTS, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

HORNBY, Justice.

The primary issue in these two cases, which were consolidated for oral argument, is whether the Maine Workers' Compensation Act includes the value of fringe benefits in "average weekly wages, earnings or salary" for purposes of determining the amount of workers' compensation benefits an injured employee can receive. Two separate panels of the Appellate Division reached opposing results. We conclude that in cases where an employer has agreed to pay a specific dollar amount per unit of time worked by each employee, such payments are included within the definition of "average weekly wages, earnings or salary."

The "average weekly wages, earnings or salary" that determines the amount of workers' compensation an injured employee can receive has three statutory definitions: (1) "the amount which [the employee] was receiving ... for the hours and days constituting a regular full working week"; (2) if the employee has not been working for 200 full working days, an amount determined by the "amount of wages or salary earned" during the preceding year; (3) if neither of the two previous methods can "reasonably and fairly be applied," then "the weekly earning capacity of the injured employee" based upon consideration of the previous wages, earnings or salary of this employee or of other employees in similar circumstances in the same or in a neighboring locality. 39 M.R.S.A. § 2(2)(A)(B) & (C) (1978 & Pamph.1988).

For both Ashby and Gurney, a collective bargaining agreement committed the employer to a specific hourly rate of pay, and an additional hourly amount to be paid to various union-established funds for employee health benefits, pension benefits, etc. For each employee hour worked, therefore, the employer paid a total amount that included both wages and other benefits. Under one agreement the employees could, by union vote, alter the allocation of the so-called fringe benefits among the various

accounts and could even increase their takehome pay at the expense of contributions to the accounts. Under the other agreement any increase in required contributions to the union-established funds would result in an automatic equivalent reduction in takehome pay. If the employer failed to make payments to the union-established funds, the amounts could be recovered by the employees in an action for failure to pay wages.

We are not persuaded by the employer's argument that because of the first statutory definition our focus should be only on what is "received." In *Coffin v. Hannaford Brothers Co.,* 396 A.2d 1007, 1008–09 (Me.1979), we established that the relevant question is what the employee is "entitled to receive." Clearly, items like garnished wages, payroll deductions for contributions to the United Fund and payroll deductions for family health insurance benefits (where the employer pays only the worker's share) are not "received," yet fall within "average weekly wages, earnings or salary." The second definition, referring to what has been "earned" and especially the third or catchall definition, referring to "earning capacity," make clear that the Legislature had a more expansive definition in mind than merely the dollar number on the paychecks or the currency in the pay envelope.

In these two cases, the employees' "earning capacity"—what they actually "earned"—is reflected in the total amount that the employer paid per hour. That is the amount bargained for. Sums paid to the union's fringe benefit accounts are payments that the employer would otherwise have been obliged to make directly to the employees. A change in the employer's contribution to the fringe benefit accounts would have been matched by an offsetting dollar-for-dollar change in wages. Thus, the total payments represent the true cost of labor so far as the employer is concerned and "earning capacity" so far as the employees are concerned.

The employer points out that fringe benefits were largely nonexistent when the workers' compensation system was established. That seems to us to be an argument in favor of including benefits such as these, for they have clearly developed as a wage substitute: instead of takehome pay, employees bargain for such benefits because of federal income tax advantages and other reasons. We are not persuaded that recognizing this economic reality will result in such a sudden and unexpected increase in compensation benefits that we must conclude that the Legislature could not have intended to include them. We are not dealing here with the traditional fringe benefit arrangement where the employer unilaterally establishes a plan in which the employee may have no vested rights, and contributes an amount that has no specified value per employee or per unit of time worked [1] and that may in fact vary from year to year at the employer's discretion. Instead, this is a case in which the labor contract specifies an amount that the employer must pay per unit of time worked and the employer totally relinquishes control over the funds just as if they were delivered in the pay envelope.

The employer argues that the ceiling on compensation benefits is set by reference to the unemployment compensation statute, that the unemployment compensation statute defines wages *not* to include certain fringe benefits, and that the workers' compensation statute should therefore be interpreted the same way. The unemployment compensation statute's exclusion for fringe benefits, however, is explicitly limited to payments made "under a plan or system established by an employer." 26 M.R.S.A. § 1043(19)(B)(1) (1988). The payments here are made to *union*-established plans.

Finally, the United States Supreme Court's decision in *Morrison–Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs,* 461 U.S. 624, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983), although contrary to the result we

---

1. The first time the Appellate Division excluded fringe benefits from the definition of "average weekly wages, earnings or salary," it pointed out that the benefits there were not awarded per unit of time worked. *See Libby v. G.T.E. Sylvania,* No. 83–98 (Me.Workers' Comp.Comm'n App.Div. Oct. 7, 1983).

reach here, is not controlling. In that case, the United States Supreme Court was interpreting the Longshoremen's and Harborworkers' Compensation Act, not the Maine Workers' Compensation Act. The parties there did not argue the definition of wages in the federal statute that is closest to the Maine statute, namely, "the money rate at which the service rendered is recompensed under the contract." Instead, they focused their argument solely on whether the employer's fringe benefit contributions met the federal Act's collateral definition of an "advantage received from the employer" that was "similar" to "board, rent, housing, [or] lodging," *id.* at 629–30, 103 S.Ct. at 2048–49, and the Court found that the fringe benefits there were not. *Id.* at 635, 103 S.Ct. at 2051. The Maine statute contains no such language.

For all these reasons we conclude that where an employer has contracted to pay a specific dollar amount per unit of employee time worked, such payments fall under the definition of "average weekly wages, earnings or salary" for purposes of calculating compensation benefits.

There is an additional issue in the *Gurney* case. After initially paying benefits for total incapacity, the employer filed a certificate of suspension and review on July 30, 1986, under 39 M.R.S.A. § 100 (Pamph.1988), and reduced Gurney's benefits to 55 percent as of that date. After hearing, the Commission determined on March 13, 1987, that Gurney "is incapacitated at a rate of 40 percent." That determination controlled the amount the employer was obligated to pay thereafter. The Commission also ordered the employer to pay total compensation benefits until July 30, 1986, the date the employer filed its certificate of suspension and review. The problem is created by a separate sentence in the decree that states: "Thereafter [after July 30, 1986], the employer is ordered to pay the employee fixed benefits at a rate of 40 percent." Since the employer had already been paying at a rate of 55 percent during that period, the statement is puzzling. The employer apparently took it as license to set off the 15 percent difference against future benefits; Gurney challenges

any authority to reduce his benefits "retroactively." On appeal the Appellate Division did not reach the issue of whether the employer could recover these "overpayments," as two separate opinions of the three-member panel pointed out. We were informed at oral argument that this specific issue in *Gurney* has been set for a hearing before the Commission in the near future. If the Commission should determine that the employer cannot set off these "overpayments," the issue purportedly before us now will be moot. Given the ambiguity of the Commission's original statement, the Appellate Division's decision not to address the issue specifically and the pending hearing before the Commission, we conclude that it is premature for us to address it at this time.

The entry is:

Judgment of the Appellate Division affirmed in Gurney and vacated in Ashby; remanded for further proceedings.

All concurring.