**James FLETCHER**

v.

**HANINGTON BROTHERS, INC., et al.**

Supreme Judicial Court of Maine.

Argued June 22, 1994.

Decided Sept. 2, 1994.

Brian Swales, (orally), Houlton, for the employee.

Jonathan Sprague, (orally), Stevens, Engels, Bishop & Sprague, Presque Isle, for the employer.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

LIPEZ, Justice.

This appeal raises the issue whether optional deductions from an employee's pay for the purchase of health insurance must be included in the calculation of the employee's "average weekly wage" pursuant to 39 M.R.S.A. § 2(2) (1989), *repealed and replaced by* P.L.1991, ch. 885, § A–7 (effective January 1, 1993), *codified as* 39–A M.R.S.A. § 102(4) (Supp.1993). Because we conclude that the employee's average weekly wage does include such deductions, we vacate the decisions of the Appellate Division and the Commission.

Fletcher began work for the employer, Hanington Brothers, in 1990 at a salary of $350 per week. After working 60 days, Fletcher became eligible to enroll in an optional health benefit plan. Employees electing to participate in the plan are required to relinquish a portion of their weekly earnings which is pooled with the employer's contribution of $98.93 per month for the purchase of health insurance. The amount of the wage reduction depends upon the employee's choice among three coverage options: coverage for the employee alone, coverage for the employee and a single child, or coverage for the employee and a larger family. In 1990, the weekly wage deductions for the three coverage options were $9.05, $31.39 and $56.88, respectively. Fletcher elected to purchase family health insurance, resulting in a reduction of his weekly take-home pay from $350.00 to $293.12.

Fletcher suffered a compensable injury on October 18, 1990. Hanington Brothers voluntarily paid Fletcher total incapacity benefits based on his weekly take-home pay of $293.12. In 1991, Fletcher filed a petition to determine his compensation rate, contending that the $56.88 wage reduction should be included in the calculation of his "average weekly wage." The Commission denied the petition in May 1992 and the Appellate Division affirmed in November 1993.

Because the petition was pending on the effective date of Title 39–A, the issue is governed exclusively by the former Act. *Riley v. Bath Iron Works Corp.*, 639 A.2d 626 627–29 (Me.1994); *Maine Workers' Compensation Act of 1992*, P.L.1991, ch. 885, § A–7

(effective January 1, 1993). Moreover, the 1991 amendment to section 2(2) that specifically addresses "fringe benefits" did not apply to this proceeding because the petition was pending on the effective date of that amendment. *Tompkins v. Wade & Searway Constr. Corp.*, 612 A.2d 874, 879 (Me.1992); P.L.1991, ch. 615, §§ A–20, D–25 (effective October 17, 1991), *codified as* 39 M.R.S.A. § 2(2)(G) (Supp.1991). Therefore, we apply the statute that was in effect at the time of our decision in *Ashby v. Rust Eng'g Co.*, 559 A.2d 774 (Me.1989). We do not imply, however, that the result in this case would be different under either the 1991 amendment to section 2(2) or Title 39–A.

In *Ashby*, we held that employer payments to certain union-established funds for the purchase of health, pension and other benefits must be considered in the calculation of average weekly wage. *Id.* at 775. Although the statutory definition of "average weekly wage" at the time of *Ashby* did not specifically address employee benefit plans, we noted that "the Legislature had a more expansive definition in mind than merely the dollar number on the paychecks or the currency in the pay envelope." *Id.* We held that the statutory definition of "average weekly wage" is not limited to what the employee "received," but includes what the employee is "entitled to receive." *Id., quoting Coffin v. Hannaford Bros.*, 396 A.2d 1007, 1008–09 (Me.1979).[1] We noted that "items like garnished wages, payroll deductions for contributions to the United Fund and payroll deductions for family health insurance (where the employer pays only the worker's share) are not 'received,' yet fall within 'average weekly wages, earnings or salary.'" *Ashby*, 559 A.2d at 775. Although all of these listed items in *Ashby* could not be characterized as an "employee benefit," they shared the feature that they were paid for by the employee directly out of the weekly wage.[2]

---

**1.** We noted in *Ashby* that the statute provided three mutually exclusive methods of computing average weekly wage: Subsection 2(2)(A) applied to employees who worked at least 200 days in the year immediately preceding the injury. 39 M.R.S.A. § 2(2)(A) (1989), *repealed and replaced by* P.L., 1991, ch. 885, § A–7 (effective January 1, 1993), *codified as* 39–A M.R.S.A. § 102(4) (Supp. 1993). Pursuant to this subsection, "average weekly wage" was defined as the "amount which [the employee] *was receiving* at the time of the injury for the hours and days constituting a regular full working week." *Id.* (emphasis added). Subsection 2(2)(B) applied to employees who worked less than the required 200 days as provided in subsection (A). 39 M.R.S.A. §§ 2(2)(B) (1989). Pursuant to this section, "average weekly wage" was "determined by dividing the entire amount of wages or salary *earned* . . . during [the] immediately preceding year, by the total number of weeks" worked by the employee. *Id.* (emphasis added). Subsection 2(2)(C) provided an alternative method of calculating the employee's *"earning capacity"* that applies when the two preceding approaches "cannot reasonably and fairly be applied. . . ." 39 M.R.S.A. § 2(2)(C) (1989) (emphasis added). *See St. Pierre v. St. Regis Paper Co.*, 386 A.2d 714, 718 (Me. 1978). The new Act provides a similar methodology for calculating the average weekly wage. *See* 39–A M.R.S.A. §§ 102(4)(A), (B), (C), & (D) (Supp.1993).

Shortly after *Ashby*, the Legislature amended the definition of average weekly wage with the purpose of expressly overruling that decision. *Tompkins*, 612 A.2d at 876. Section 2(2)(G) provides as follows:

"Average weekly wages, earnings or salary" does not include fringe benefits, including but not limited to employer payments for or contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan for the employee's or dependent's benefit or any other employee's dependent entitlement. P.L.1991, ch. 615, § A–20, *codified as* 39 M.R.S.A. § 2(2)(G) (Supp.1991) (effective October 17, 1991), *repealed and replaced by* P.L., 1991, ch. 885, § A–7 (effective January 1, 1993), *codified as* 39–A M.R.S.A. § 102(4)(H) (Supp. 1993).

**2.** Although the above-quoted language from *Ashby* specifically refers to payroll deductions for family health insurance, that language alone is not dispositive of the issue presented here. Fletcher's $56.88 weekly health benefit contribution is not a "payroll deduction[] for family health insurance (where the employer pays only the worker's share)" because Fletcher contributes to the purchase of health insurance coverage for himself in addition to coverage for his family. *See Ashby*, 559 A.2d at 775. We note, however, that whether the employee's payment is for the employee's health insurance or for the health insurance of the employee's family is irrelevant to the issue of whether the payment is to be included in the average weekly wage. The focus should be on the source of the payment and its relationship to the employee's earning capacity.

Also, the above-quoted discussion from *Ashby* was specifically addressed to the employer's argument that, pursuant to the definition of "average weekly wage," calculation of the average

We then focused in *Ashby* on four features of the benefit plan that distinguished it from a "traditional" benefit package.[3] *Id.* at 775. First, it was a "union-established" plan entered into pursuant to a collective bargaining agreement. *Id.* Second, "[s]ums paid to the union's fringe benefit accounts [were] payments that the employer would otherwise have been obliged to make directly to the employees." Third, the amounts were paid per unit of time worked by the employee. Finally, under the plan, the employer had no discretionary control over the funds, but "totally relinquishe[d] control over the funds just as if they were delivered in the pay envelope." *Id.*

In *Clark v. Rust Eng'g Co.*, 595 A.2d 416 (Me.1991), we relied on similar factors to conclude that payments for the benefit plan in that case should not be included in the employee's average weekly wage. *Id.* at 420. In contrast to the benefit package in *Ashby*, the plan in *Clark* was unilaterally established and fully funded by the employer. Under the *Clark* plan, the employer was not required to make payments per unit of time worked nor was the employer otherwise obligated to make the payments directly to the employee. *Id.* We also held that even though mandatory employer contributions to social security insurance were made per unit of time worked, these payments were not part of the weekly wage because the employee had no power to exchange these payments for equivalent payments in cash. *Id.* at 421.

In this case, the Appellate Division relied on our decisions in *Ashby* and *Clark* to hold that Fletcher's $56.88 deduction for health insurance could not be included in the calculation of his weekly wage. Analyzing the factors discussed in those cases, the Appellate Division concluded that the benefit plan in this case is most similar to the "tradition-al" fringe benefit plan in *Clark* and therefore the payments should not be included in the average weekly wage. We disagree with the analysis and the conclusion of the Commission.

Ultimately, "[t]he purpose of calculating an average weekly wage is to arrive at an estimate of the 'employee's future earning capacity as fairly as possible.'" *Nielson v. Burnham & Morrill*, 600 A.2d 1111, 1112 (Me. 1991) (quoting *Fowler v. First Nat'l Stores*, 416 A.2d 1258, 1260 (Me.1980)). The factors discussed in *Ashby* and *Clark* represent a method for arriving at a fair estimate of future earning capacity under a specific set of facts. They must not be applied mechanically, without an awareness of the underlying purpose of the analysis. Factors that are important in the context of a complex, union-negotiated plan, as we encountered in *Ashby*, may not be relevant to the analysis of a relatively simple benefit scheme, like the one we encounter here.

The Appellate Division noted that, like *Clark*, the benefit plan in this case was unilaterally established by the employer and benefits were not paid for a unit of time worked. The Appellate Division incorrectly concluded, however, that the plan was unilaterally funded by the employer. Fletcher contributed a portion of his weekly wage to the direct purchase of his health insurance coverage. We note also that the Appellate Division did not discuss the *Ashby* factor that has the most bearing on this appeal: whether the employee could freely exchange the benefit payment for an equivalent payment in cash. As we emphasized in *Clark*, the ability of the employee to elect to receive cash rather than benefits was critical to our decision in *Ashby*. *Clark*, 595 A.2d at 419, 421. Under the benefit plan involved in this

weekly wage is limited to what the employee "receives" in the weekly paycheck. *See Id.* The reference in *Ashby* to garnished wages, United Fund contributions and deductions for family health insurance was intended merely as a list of items that might, in appropriate circumstances, be included in the average weekly wage.

3. *Ashby* involved two benefit agreements. Under the first agreement, the employer paid a total amount per hour of time worked and the union could vote to allocate a proportion of that pay-ment to fringe benefits and take-home wages. *Id.* at 774–75. Under the second agreement, we noted that "any increase in required contributions to the union-established funds would result in an automatic equivalent reduction in take-home pay." *Id.* We noted further that "[i]f the employer failed to make payments to the union-established funds, the amounts could be recovered by the employees in an action for failure to pay wages." *Id.*

appeal, Fletcher could freely elect to receive the $56.88 in cash in lieu of benefits. In this sense, Fletcher individually could do what the union collectively could do in *Ashby*—alter the allocation of wages between take-home pay and contributions to a benefit plan.

We emphasize that Fletcher does not seek to include the *employer's* contribution of $98.93 per month in the weekly wage, but only that portion that was deducted from his wages. In effect, Hanington Brothers has asked its employees to contribute directly to the purchase of health benefits. Hanington Brothers now seeks to take advantage of this feature of the plan to contend that Fletcher's contribution resulted in a reduction of his wages. We note that the amount of the employee's contribution depends upon the nature of the health insurance coverage the employee elects to receive. If we were to measure Fletcher's weekly wage solely by reference to his take-home pay, as Hanington Brothers suggests, we would be forced to conclude that an employee who elects to receive individual health insurance under the same plan has a higher average weekly than an employee, like Fletcher, who elects to purchase health insurance for his entire family. Clearly, Fletcher's decision to provide health insurance for his family has no relationship whatsoever to his future capacity to earn.[4]

It is clear from the record that Fletcher has a capacity to earn $350 per week; indeed, he earned this wage during his first 60 days of employment. Fletcher's weekly take-home pay was reduced prior to his injury, not due to an inability to earn his prior wage, but because he voluntarily chose to purchase health insurance for his family

through the benefit package offered by his employer. Pursuant to section 2(2) of former Title 39, Fletcher's wage deductions for the purpose of purchasing health insurance should be included in the employee's average weekly wage.

The entry is:

The decisions of the Appellate Division and the Commission are vacated. Remanded to the Workers' Compensation Board for further proceedings consistent with the opinion herein.

All concurring.

---

4. The Commission relied in part on the fact that the $56.88 wage reduction is not considered income under section 125 of the Internal Revenue Code. 26 U.S.C. § 125 (1993). This fact is not dispositive. *See Ashby*, 559 A.2d at 775. The Internal Revenue Code and the Maine Workers' Compensation Act were enacted for entirely different purposes. The purpose of the Workers' Compensation Act is "to provide compensation for loss of earning capacity for actual or presumed incapacity." *Leo v. American Hoist & Derrick Co.*, 438 A.2d 917, 922 (Me.1981). An employee's capacity to earn is not reduced by the fact that portions of the employee's compensation may be exempt from taxation. A congres-

sional decision to tax or not to tax may be based on a variety of reasons completely unrelated to the employee's capacity to earn. We note that section 125 of the Internal Revenue Code was primarily intended to reduce the tax burden on individual employees and thereby promote tax fairness and economic growth. *See* S.Rep. No. 1263, 95th Cong., 2nd Sess. 13–16, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6776–79; H.R.Rep. No. 1445, 95th Cong., 2nd Sess. 9–15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 7051–55. In the context of a benefit plan under section 125 of the Internal Revenue Code, the tax code definition of "gross income" is not relevant to the calculation of average weekly wage.