2002 ME 163

**Alice J. COULOMBE**

v.

**ANTHEM BLUE CROSS/BLUE
SHIELD OF MAINE, INC.
et al.**

Supreme Judicial Court of Maine.

Argued: Oct. 10, 2002.
Decided: Nov. 1, 2002.

Alexander F. McCann, Esq., (orally), Portland, for employee.

Robert W. Bower, Jr., (orally), Norman, Hanson & DeTroy, LLC, Portland, for employer.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Anthem Blue Cross/Blue Shield of Maine, Inc., appeals from a decision of a hearing officer of the Workers' Compensation Board granting the employee's petition for award and awarding partial incapacity benefits. Anthem challenges the hearing officer's interpretation of Board Rule chapter 1, § 5(3)(A), which permits the inclusion of fringe benefits in the employee's post-injury wages "to the same extent" that fringe benefits are included in the pre-injury wages. Me. W.C.B Rule ch.1, § 5(3)(A). Because the Board Rule represents a clarification of an ambiguity in the governing statute and does not ex-

ceed the scope of the Board's rulemaking authority, we affirm.

## I. CASE HISTORY

[¶ 2] Alice J. Coulombe suffered a work-related injury in May 1999, while employed by Blue Cross/Blue Shield of Maine.[1] She returned to work in August 2000. Coulombe found post-injury work with a different employer, Maine Medical Center for Cancer (MMCC), in October 2000. She left that employment in November 2000, for family medical care reasons, returning to work for MMCC in June 2001.

[¶ 3] Coulombe filed a petition for award of partial incapacity benefits in August 2001. The parties agreed that Coulombe's pre-injury average weekly wage was $571.00 with an additional $121.97 in fringe benefits. The parties also agreed that her current weekly earnings at MMCC are $460 with an additional $188.81 in fringe benefits. The hearing officer granted Coulombe's petition for partial incapacity benefits.

[¶ 4] The law, 39–A M.R.S.A. § 102(4)(H) (2001), requires the inclusion of noncontinuing fringe benefits in the calculation of the employee's pre-injury wage in many circumstances.[2] *See Beaulieu v. Me. Med. Ctr.*, 675 A.2d 110, 111 (Me. 1996). The law does not directly address calculation of fringe benefits in computing the post-injury average weekly wage.

Board Rule chapter 1, § 5(3)(A), addresses calculation of fringe benefits in the post-injury average weekly wage as follows: "The fringe benefit package of any subsequent employers must be included in the computation of the employee's post-injury earnings *to the same extent* that it is included in the employee's pre-injury average weekly wage." Me. W.C.B. Rule ch. 1, § 5(3)A (emphasis added).

[¶ 5] Although Coulombe had higher fringe benefits in her post-injury employment than in her pre-injury employment, the hearing officer interpreted Rule 5(3)(A) to mean that because the employee had $121.97 in pre-injury fringe benefits, Coulombe's fringe benefits in her post-injury employment would also be calculated at $121.97 a week in determining her entitlement to partial incapacity benefits.

[¶ 6] The hearing officer computed Coulombe's pre-injury earnings by adding Coulombe's pre-injury wage and her fringe benefits ($571 + $121.97 = $692.97). Using the Board's Weekly Benefit Table, 80% of the after-tax average weekly pre-injury wage is $450.02.[3]

[¶ 7] Adding the current post-injury earnings and fringe benefits results in a post-injury wage of $581.97 ($460 + $121.97). Using the Weekly Benefit Table, 80% of the after-tax weekly post-injury wage is $387.34. Calculating the benefit for this period results in a weekly benefit of $62.68 ($450.02—$387.34). If all of Cou-

---

**1.** In 2000, Blue Cross/Blue Shield of Maine was acquired by Anthem Insurance Companies after approval by the Superintendent of Insurance.

**2.** Section 102(4)(H) of Title 39–A provides:

**H.** "Average weekly wages, earnings or salary" does not include any fringe or other benefits paid by the employer that continue during the disability. Any fringe or other benefit paid by the employer that does not continue during the disability must be in-

cluded for purposes of determining an employee's average weekly wage to the extent that the inclusion of the fringe or other benefit will not result in a weekly benefit amount that is greater than 2/3 of the state average weekly wage at the time of the injury.
39–A M.R.S.A. § 102(4)(H) (2001).

**3.** No issues are raised regarding the hearing officer's approach to calculating the benefits or accuracy in applying the benefit tables.

lombe's post-injury employment fringe benefits were included in the calculation, her weekly benefit would be reduced to approximately $24.

[¶ 8] Anthem filed a motion for further findings of fact. The hearing officer issued further findings of fact, but did not alter the calculation. We granted Anthem's petition for appellate review pursuant to 39–A M.R.S.A. § 322 (2001) and M.R.App. P. 23.

## II. DISCUSSION

[¶ 9] Partial incapacity benefits are calculated as "80% of the difference between the injured employee's after-tax average weekly wage before the personal injury and the after-tax average weekly wage that the injured employee is able to earn after the injury, ..." 39–A M.R.S.A. § 213(1) (2001). The Board has published weekly benefit tables for the calculation of 80% of after-tax wages.

[¶ 10] The workers' compensation law addresses calculation of fringe benefits for pre-injury earnings, but it does not address calculation of fringe benefits for post-injury earnings. This creates an ambiguity in the application of section 213 which directs calculation of partial incapacity benefits based on the difference between similar pre-injury and post-injury earnings figures.

[¶ 11] Title 39–A M.R.S.A. § 102(4)(H) limits the inclusion of noncontinuing fringe benefits in calculation of pre-injury earnings "to the extent that" the employee's benefits do not exceed two-thirds of the state average weekly wage at the time of the injury. We have interpreted the phrase "to the extent that" in section 102(4)(H) to mean that fringe benefits must be included up to the amount that is necessary to reach two-thirds of the state average weekly wage at the time of the injury. *See Hincks v. Robert Mitchell Co.,*

1999 ME 172, ¶ 12, 740 A.2d 992, 996; *O'Neal v. City of Augusta,* 1998 ME 48, ¶¶ 4–6, 706 A.2d 1042, 1043–44. In other words, if the employee's pre-injury fringe benefits are $200 a week, but the inclusion of only $100 more a week will put the employee's benefit level at two-thirds of the state average weekly wage at the time of the injury, then the Board is required to add only $100 to the employee's average weekly wage to bring the employee's benefit level up to two-thirds of the state average weekly wage at the time of the injury.

■ [¶ 12] Board Rule chapter 1, § 5(3)(A) contains a limitation which is similar to the language of section 102(4)(H), limiting the inclusion of fringe benefits "to the same extent" that the fringe benefits are included in the pre-injury wage. Me. W.C.B. Rule ch. 1, § 5(3)(A). Both parties to this case contend that fringe benefits should be included in calculation of post-injury wages, they only dispute proper application of the "to the same extent" language.

[¶ 13] Anthem concedes that the statute is silent with respect to post-injury benefits, but contends that post-injury fringe benefits must be calculated in the same way that pre-injury fringe benefits are calculated, i.e., to their full amount. Anthem also contends that, because the Board has promulgated rules defining what is included in a "fringe or other benefit," the phrase "to the same extent that" is merely intended to signify that these Board rules defining "fringe and other benefits" apply to both pre-injury and post-injury wages. However, the Board Rule provides: "The fringe benefit package of any subsequent employers must be *included* in the computation of the employee's post-injury earnings *to the same extent* that it is *included* in the employee's pre-injury average week-

ly wage." Me. W.C.B. Rule ch. 1, § 5(3)(A) (emphasis added).

[¶ 14] The original reason for excluding fringe benefits from the average weekly wage was the concept that fringe benefits were something other than money in the employee's pay. Accordingly, there was some fairness in not holding the employer to an average weekly wage that includes things other than ordinary pay. As Professor Larson states in his treatise, the average weekly wage means " 'wages' that the worker lives on and not miscellaneous 'values' that may or may not someday have a value to him or her depending on a number of uncontrollable contingencies." ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 93–01[2][b] (2002).

[¶ 15] In adopting section 102(4)(H), the Legislature elected to include fringe benefits in the average weekly wage calculation in the limited situation when an employee's weekly benefits are less than two-thirds of the state average weekly wage at the time of the injury. In *Ciampi v. Hannaford Bros. Co.*, 681 A.2d 4, 9 (Me.1996), we discussed the legislative history and the compromise between legislative forces that wanted to include or exclude fringe benefits from the pre-injury wage:

> We are not unmindful of the legislative history of this issue following our 1989 decision in *Ashby v. Rust Eng'g Co.*, 559 A.2d 774, 775 (Me.1989), in which we held that certain payments must be included in the average weekly wage when employee benefits are paid for by bargained-for, dollar-for-dollar deductions from an employee's pay.... The Legislature's immediate response to *Ashby* was the enactment of P.L.1991, ch. 615, § A–20, which purported to overturn that decision and provided that fringe benefits may not be included in an employee's average weekly wage. 39

M.R.S.A. § 2(2)(G) (Supp.1991), *repealed and replaced by* Maine Workers' Compensation Act of 1992, P.L.1991, ch. 885, §§ A–7, A–8 (effective January 1, 1993); *Tompkins v. Wade & Searway Constr. Corp.*, 612 A.2d 874, 879 (Me.1992). In light of this recent history, it is likely that the Legislature intended section 102(4)(H) to strike a balance between the *Ashby* rule and the rule of former section 2(2)(G) by providing a slightly greater recovery to those employees with the lowest weekly benefits.

*Id.* (citations omitted).

[¶ 16] The law authorizes an eight-member Workers' Compensation Board for the purpose of administering the Workers' Compensation Act, to be equally divided between representatives of labor and management. 39–A M.R.S.A. § 151(1) (2001). As we have stated, the enactment of Title 39–A in 1992 reflected a legislative intent "to assign Maine's unique and persistent problems of compensation utilization and duration to 'a new labor-management board, which will have virtually total control over the operation of the system.' " *Bureau v. Staffing Network, Inc.*, 678 A.2d 583, 588 (Me.1996) (quoting Report of Blue Ribbon Commission to Examine Alternatives to the Workers' Compensation System and to Make Recommendations Concerning Replacement of the Present System, Findings of the Majority of the Blue Ribbon Commission 2 (August 31, 1992) [hereinafter Report, Findings] ). We have recognized that:

> Title 39–A was intended to address workers' compensation issues that are unique to Maine. As the [Blue Ribbon] Commission stated, "the Maine workers' compensation system is utilized in a different manner than virtually every other state's system. There is little question that Maine employees use the system more frequently than do employees in

other states and stay in the system longer." [Report, Findings] at 1. The Act reflects not so much a legislative intent to comprehensively address every workers' compensation issue in a detailed and specific way, but to commit some issues *to a process in which the participants in the system, labor and management, can work out flexible and realistic solutions. Id.* at 2–3. *Mathieu v. Bath Iron Works,* 667 A.2d 862, 866, n. 6 (Me.1995) ("[A]ll decisions regarding workers' compensation are developed through consensus by the new board of directors we're creating.... It's the only way management and labor can come together in this era.") (quoting Legis. Rec. S–60 (3rd Spec.Sess.1992) (Statement of Sen. Esty)).

*Id.* at 588 n. 2. *See also Jasch v. Anchorage Inn,* 2002 ME 106, ¶ 9, 799 A.2d 1216, 1218; *Russell v. Russell's Appliance Serv.,* 2001 ME 32, ¶ 10 n. 3, 766 A.2d 67, 71 n. 3.

■ [¶ 17] Accordingly, the Board has been given broad authority to promulgate rules, and we will defer to the Board's rulemaking except where the rules conflict with statutory language. *E.g., Beaulieu,* 675 A.2d at 111. The Board Rule in the present case does not conflict with the statutory language. In light of the history of the fringe benefit issue in Maine, we conclude that the *Board has not exceeded the scope of its rulemaking authority in clarifying a* benefit calculation issue that otherwise would be ambiguous. *See* 39–A M.R.S.A. § 152(2) (2001) (Board has general rulemaking authority). We also conclude that the hearing officer did not err in applying the Board Rule.

The entry is:

Decision affirmed.