2001 ME 4

**Gary McADAM**

v.

**UNITED PARCEL SERVICE**

and

**Helmsman Management Services, Inc.**

Supreme Judicial Court of Maine.

Argued Sept. 6, 2000.

Decided Jan. 9, 2001.

Alexander F. McCann (orally), James J. MacAdam, MacAdam & McCann, P.A., South Portland, for employee.

John P. Flynn III (orally), Troubh, Heisler, Piampiano, P.A., Portland, for employer, United Parcel Service.

Mark V. Franco, Thompson & Bowie, Portland, for employer, City of Portland..

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] United Parcel Service appeals from a decision of a hearing officer of the Workers' Compensation Board raising several issues relating to the hearing officer's grant of Gary McAdam's petition to fix compensation and the determination of McAdam's average weekly wage. UPS also appeals from the hearing officer's decision declining to apportion liability against McAdam's subsequent employer, the City of Portland. We vacate the decision and remand to the hearing officer for further proceedings.

## I. BACKGROUND

[¶ 2] Gary McAdam began employment at United Parcel Service in 1987 after a prior career as a professional ice hockey player. McAdam alleges that he suffered a work-related shoulder injury at UPS in 1990. McAdam terminated employment with UPS sometime after February 1994.

[¶ 3] After he ceased working for UPS, McAdam began working as a bus driver, first for the Town of Cape Elizabeth and later for the City of Portland. Beginning in January 1995, he increased his hours as a bus driver for the City of Portland to thirty hours a week, and then to forty hours a week in 1996, exclusive of summers. During that period, UPS voluntarily paid McAdam a weekly partial incapacity benefit of $171.16.

[¶ 4] McAdam eventually requested vocational rehabilitation through the Board. A plan was prepared by a rehabilitation specialist and adopted after a hearing by the Workers' Compensation Board Rehabilitation Assistant Administrator. Pursuant to the plan, McAdam enrolled in a full-time two-year program at Kennebec Voca-

tional Technical College for training as a physical therapist's assistant.[1]

[¶ 5] In November 1997, UPS filed a petition for award against the City of Portland, seeking apportionment of liability and alleging that McAdam suffered bilateral shoulder injuries during his post-injury employment as a bus driver. At approximately the same time, McAdam filed petitions to fix medical expenses and to determine his average weekly wage. The proceedings were consolidated by the hearing officer.

[¶ 6] Prior to the hearing, UPS filed a motion to compel production of medical records relating to prior shoulder injuries McAdam had earlier reported he may have suffered during his career as a professional ice hockey player. The motion was granted, but McAdam refused to comply with the order. When the employer sought enforcement of the order at the hearing on the pending petitions, the hearing officer vacated his previous order and denied UPS's motion to compel.

[¶ 7] After the hearing, the hearing officer found that McAdam's bus driving responsibilities had not "independently produce[d] the employee's disability," and denied UPS's petition for award against the City of Portland. The hearing officer also granted McAdam's petition to determine average weekly wage, increasing his pre-injury average weekly wage from $694 to $905.65, including so-called "Ashby" fringe benefits,[2] and calculated the average weekly wage by taking the total of McAdam's earnings over the immediately preceding year and dividing by fifty-one, the number of weeks that the employee had earnings as reflected in his wage statement. Also included in McAdam's wages for that year was a $1000 one-time bonus that he received when his labor union entered into a new contract.

[¶ 8] In the original decree, the hearing officer awarded McAdam $444 in weekly benefits, based on the difference between McAdam's pre-injury wage and a theoretical post-injury earning capacity of $240 for a forty-hour week at $6 an hour. In response to the parties' motion for further findings of fact, however, the hearing officer increased the award after finding that McAdam "could not safely continue in his work as a school bus driver for the City of Portland." The hearing officer ordered varying rates of compensation with a credit for wages earned. Because McAdam chose not to work during his enrollment in vocational rehabilitation, the varying rates compensation had the effect of requiring UPS to pay close to 100% partial incapacity benefits.[3]

[¶ 9] We granted UPS's petition for appellate review pursuant to 39–A M.R.S.A. § 322 (Pamph.2000).

## II. PETITION AGAINST THE CITY OF PORTLAND

[¶ 10] The hearing officer denied UPS's petition for award against the City of Portland, finding that "[w]hile [McAdam's] bus driving duties aggravated the continuing effects of the 1990 injury, they themselves 'did not ... independently produce the employee's disability.'"

1. UPS appealed the vocational rehabilitation plan and we dismissed the appeal pursuant to 39–A M.R.S.A. § 217(2) (Pamph.2000), which provides that an order implementing a vocational rehabilitation is "final," and therefore, may not be appealed unless and until the plan is successfully completed and the employer is assessed 180% of the plan's cost. *McAdam v. United Parcel Serv.*, 2000 ME 5, ¶¶ 6–7, 743 A.2d 741, 743–44.

2. In *Ashby v. Rust Eng'g Co.*, 559 A.2d 774 (Me.1989), we held that certain payments must be included in the average weekly wage when employee benefits are paid out of bargained-for, dollar-for-dollar deductions from an employee's pay. *Id.* at 775. See *Hincks v. Robert Mitchell Co.*, 1999 ME 172, ¶¶ 9–12, 740 A.2d 992, 995–96, for a discussion on the Legislature's enactment of a statute reversing the effects of our decision in *Ashby.*

3. McAdam had some part-time earnings as a Deering High School hockey coach.

[¶ 11] In reaching that conclusion, the hearing officer relied on *Poole v. Statler Tissue Corp.*, 400 A.2d 1067, 1069 (Me. 1979). *Poole* was decided prior to the enactment of 39–A M.R.S.A. § 201(4) (Pamph.2000), which is applicable to the facts here. Subsection 201(4) provides: "If a work-related injury aggravates, accelerates or combines with a preexisting physical condition, any resulting disability is compensable only if contributed to by the employment in a significant manner." 39–A M.R.S.A. § 201(4). This section provides the standard for determining liability in cases when an alleged work-related injury combines with a preexisting condition.

[¶ 12] UPS alleged that McAdam's employment as a bus driver for the City either entirely caused his current shoulder problems or significantly contributed to the shoulder injuries that McAdam previously suffered in his employment at UPS and as a professional athlete. The task of the hearing officer, therefore, was to determine (1) whether McAdam suffered any work-related injury while working for the City, and if so, (2) whether that injury contributed to the preexisting shoulder condition in a significant manner. Thus, the hearing officer's conclusion that McAdam's employment as a bus driver for the City did not "independently cause" the shoulder injuries missed the point. When apportionment issues arise in the context of consecutive employment, if the second employment results in a "work-related injury," there exists no requirement that the second injury constitute an "independent cause" of the employee's disability in order for the second employer to be responsible for a portion of the benefits to an employee.[4] We therefore vacate the hearing officer's denial of UPS's petition for award

against the City and remand for consideration of the petition pursuant to 39–A M.R.S.A. § 201(4).

## III. AVERAGE WEEKLY WAGE

[¶ 13] UPS next challenges the hearing officer's decision to include the value of McAdam's fringe benefit plan in his weekly wage. McAdam concedes on appeal that the fringe benefits were erroneously included in his average wage, and therefore, there is no dispute that the union-benefits were incorrectly included in the weekly wage calculation. *See Hincks v. Robert Mitchell Co.*, 1999 ME 172, ¶ 12, 740 A.2d 992, 995–96. Accordingly, we vacate the hearing officer's inclusion of those fringe benefits in McAdam's average weekly wage.

[¶ 14] The remaining issues with respect to the average weekly wage calculation that merit discussion are (1) whether the hearing officer erred in averaging McAdam's pre-injury weekly wages, pursuant to 39–A M.R.S.A. § 102(4)(B) (Pamph. 2000); and (2) whether the $1000 bonus that McAdam received on the signing of a new labor agreement should be included in his yearly earnings.

### A. Averaging

[¶ 15] The determination of the average weekly wage is controlled by subsection 102(4), which provides, in pertinent part:

> A. "Average weekly wages, earnings or salary" of an injured employee means the amount that the employee was receiving at the time of the injury.... *In the case of piece workers and other employees whose wages during that year have generally varied from week to week, wages are averaged in accordance*

---

4. The hearing officer's reference to our opinion in *Poole,* along with other language in the hearing officer's decision ("McAdam did not suffer a *compensable* injury in January of 1997") may have evidenced a determination on the part of the hearing officer that McAdam did not suffer *any* work-related injury while employed by the City. *See Poole v. Stat-*

*ler Tissue Corp.,* 400 A.2d 1067, 1069 (Me. 1979). Because the hearing officer appears to have understood *Poole* to require proof by UPS that McAdam's employment with the City "independently produced" the shoulder injuries, we must remand for application of subsection 201(4).

*with the method provided under paragraph B.*

**B.** When the employment or occupation did not continue pursuant to paragraph A for 200 full working days, "average weekly wages, earnings or salary" is determined by dividing the entire amount of wages or salary earned by the injured employee during the immediately preceding year by the total number of weeks, any part of which the employee worked during the same period.

. . . .

39–A M.R.S.A. § 102(4) (emphasis added).

 [¶ 16] Both parties agree that the Board calculated the average weekly wage by averaging, applying paragraph 102(4)(B). UPS contends that because the employment lasted longer than 200 days, the hearing officer should have applied paragraph 102(4)(A). We disagree. The plain language of subparagraph A requires averaging when the wages have "varied from week to week," without regard to the 200 day cutoff. 39–A M.R.S.A. § 102(4)(A).

 [¶ 17] The mere fact that wages are not identical from week to week, however, does not mean that the wages "varied" for purposes of subparagraph A. The extent and frequency of fluctuation will determine whether the wages varied for purposes of averaging. Thus, the hearing officer was required to determine whether the fluctuations in McAdam's wages constituted a "variance" pursuant to subparagraph A.[5] During the year in question, McAdam's wages ranged from a low of

$443.56 to a high of $948.42 and varied substantially within that range from week to week. The hearing officer acted within his authority in determining that McAdam's wages varied from week to week, therefore requiring that the average weekly wage be calculated by averaging.

B. Bonus

 [¶ 18] The next issue is whether the hearing officer should have treated McAdam's $1000 bonus as a "fringe or other benefit" for purposes of paragraph 102(4)(H). 39–A M.R.S.A. § 102(4)(H) (Pamph.2000). The bonus was awarded to UPS employees as a result of a new labor agreement contract. UPS contends that the one-time $1000 bonus was not a part of McAdam's wages but rather falls within the category of "fringe or other benefit," 39–A M.R.S.A. § 102(4)(H). Therefore, according to UPS's argument, the hearing officer erred in failing to determine whether inclusion of that bonus would result in a weekly benefit greater than two-thirds of the state average weekly wage at the time of the injury.[6]

[¶ 19] The Act contains no explicit references to the treatment of a bonus. Therefore, in determining whether such a payment should be included in the average weekly wage as "wages" or treated separately, we look again to the definition of average weekly wages, which is defined as "the amount that the employee was receiving at the time of the injury for the hours and days constituting a regular full working week." 39–A M.R.S.A. § 102(4)(A).

---

5. UPS also contends that the Board erred in dividing the employee's total wages by fifty-one, the number of weeks that reflect earnings in the employee's wage statement, rather than fifty-two, the number of weeks in the year. Because McAdam neither worked nor received pay in that week, the hearing officer did not err in using the fifty-one weeks. *See* 39–A M.R.S.A. § 102(4)(B) (Pamph.2000); *Nielsen v. Burnham & Morrill, Inc.,* 600 A.2d 1111, 1112 (Me.1991).

6. Subsection 102(4)(H) states:

**H.** "Average weekly wages, earnings or salary" does not include any fringe or other benefits paid by the employer that continue during the disability. Any fringe or other benefit paid by the employer that does not continue during the disability must be included for purposes of determining an employee's average weekly wage to the extent that the inclusion of the fringe or other benefit will not result in a weekly benefit amount that is greater than ⅔ of the state average weekly wage at the time of the injury.

39–A M.R.S.A. § 102(4)(H) (Pamph.2000).

Fringe *or other benefits* are not includable in that amount unless (1) they are not continued during the disability and (2) the inclusion of the fringe or other benefit will not result in a weekly benefit amount that is greater than two-thirds of the state average weekly wage at the time of the injury. 39–A M.R.S.A. § 102(4)(H).

[¶ 20] Because the language of paragraph 102(4)(H) contains no guidance for interpreting the phrase, "fringe or other benefits," we look to legislative history and Board rules to determine whether a one-time signing bonus should be treated as wage, fringe benefit, or other benefit.

[¶ 21] We have no difficulty in concluding that a bonus is not a "fringe benefit." Fringe benefits have traditionally referred to goods or services purchased by the employer for the employee.[7] Most often, fringe benefits take the form of some benefit other than an immediate payment of cash, for example, employer contributions specifically earmarked for the purchase of health, disability, or retirement insurance.[8] The payment of a cash bonus does not fall within the description of fringe benefits.

[¶ 22] Because a bonus is clearly not a "fringe benefit," we must determine whether the Legislature intended to encompass bonuses within the description of "other benefits," contained in section 102(4)(H). The Legislature has not defined "other benefits" and, although the Board has promulgated an interpretive rule for paragraph 102(4)(H), the rule contains no definition of "other benefits" and is silent with regard to the treatment of bonuses. Me. W.C.B. Rule ch. 1, § 5(1).

[¶ 23] Our only occasion to address bonuses arose long before the enactment of section 102(4)(H). In *Freeman v. Co–Hen Egg Co.*, 430 A.2d 1107 (Me.1981), a case that preceded both former section 2(2)(G) and current section 102(4)(H), we held that it was error to exclude the employee's annual bonus from his average weekly wage when the bonus was a part of the employee's regular annual compensation for the hours and days of service. *Id.* at 1108. We relied, in part, on a rule of the former Workers' Compensation Commission expressly providing that "[i]n computing the average weekly wage, vacation pay, bonuses, tips, etc. should be included in the total amount of earnings for the period employed." *Id.* (citing former Me. W.C.C. Rule 7(a) (1981)). We again relied, in part, on the former Commission rule in *Nielsen v. Burnham & Morrill, Inc.*, 600 A.2d 1111 (Me.1991), in which we affirmed a decision of the Commission to include vacation pay in the employee's average weekly wage.

---

7. Prior to the enactment of title 39–A. Maine was among the majority of jurisdictions that did not permit the inclusion of "fringe benefits" in the calculation of average weekly wage. *See* 5 ARTHUR LARSON, LARSON'S WORKER'S COMPENSATION LAW, § 93.01(2)(b) (2000). Former paragraph 2(2)(G) provided:

"Average weekly wages, earnings or salary" does not include fringe benefits, including but not limited to employer payments for or contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan for the employee's or dependent's benefit or any other employee's dependent entitlement.

P.L.1991, ch. 615, § A–20, *codified as* 39 M.R.S.A. § 2(2)(G) (Supp.1991) (effective October 17, 1991), *repealed by* P.L., 1991, ch. 885, § A–7. The nonexclusive list in former subsection 2(2)(G) provides some guidance for interpreting the phrase "fringe benefit" in the former statute. All of the items on the list pertain to employer contributions to the purchase of some specific item falling outside the traditional monetary compensation usually paid to employees as wages, e.g., life insurance, health benefits, a dependent benefit plan, etc. It is also revealing that purely monetary payments to employees such as tips, bonuses, commissions, vacation, and holiday pay, etc., do not appear on the list.

8. This interpretation is consistent with a common understanding that fringe benefits consist of something other than direct monetary payments to the employee, *see* 5 LARSON, *supra* note 7, § 93.01(2)(a), and is also consistent with our interpretation of fringe benefits pursuant to former title 39. *See, e.g., Nielsen,* 600 A.2d at 1112; *Freeman v. Co–Hen Egg Co.,* 430 A.2d 1107, 1108 (Me.1981); *see also* Me. W.C.C. Rule 16.8 (1991), *replaced by* Me. W.C.B. Rule ch. 1, § 5(1).

*Id.* at 1112 (citing former Me. W.C.C. Rule 16.8 (1991), *replaced by* Me. W.C.B. Rule ch. 1, § 5(1)).

[¶ 24] Examination of decisions from other jurisdictions suggests that, although most states exclude fringe benefits from the average weekly wage, bonuses are often included in the average weekly wage. *See* 5 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW, § 93.01(2)(a) (2000). The cases turn on a variety of rationales.[9] Generally, cash bonuses are included as wages when they represent value received as consideration for work. *Id.*

[¶ 25] We conclude that the determination as to whether a bonus received by an employee is part of wages or is an "other benefit," pursuant to section 102(4)(H), relates to the nature of the bonus received.[10] If the bonus is regularly received by the employee as a part of an ongoing compensation scheme, such as annual bonuses, or is a bonus related to productivity or other employee and employer accomplishments, or is based on other measurable employee goals, it should be included in the employee's wages. *Cf. Clukey v. Piscataquis County Sheriff's Dep't,* 1997 ME 124, ¶¶ 9–11, 696 A.2d 428, 431 (holding that unrestricted cash payments to military personnel ostensibly for meals and housing were wages not "fringe or other benefit(s)"). If, in contrast, the

bonus is a one-time event, not related to the employee's work, efforts, or employment goals, it must be considered an "other benefit," pursuant to 39–A M.R.S.A. § 102(4)(H). *See* 5 LARSON, § 93.01(2)(a).

[¶ 26] Here, McAdam received his bonus as a result of the negotiations between the union and the employer. The new contract provided that "[a]ll seniority employees on the payroll as of 7/31/90 shall be paid *a one-time signing cash bonus* within one month following ratification." (Emphasis added). This one-time bonus did not represent compensation for work performed, it was not part of an ongoing compensation scheme, it was not expected to recur, and it was not related in any way to McAdam's performance. It was, therefore, not representative of the amount that McAdam was receiving at the time of the injury for hours and days worked. *See* 39–A M.R.S.A. § 102(4)(A). Accordingly, it falls not within the definition of wages, but within the catch-all of "other benefits" subject to the restrictions of section 102(4)(H).

## IV. EARNING CAPACITY

### A. Post-injury Earning Capacity

[¶ 27] UPS next contends that the hearing officer erred in finding a post-injury earning capacity of $240 a week in

9. Some jurisdictions have suggested that bonuses should be included in the average weekly wage when they are tied to the employee's work performance, e.g., hours of service, output produced, or profitability or performance of the employer's business as a whole. *See, e.g., Denim Finishers, Inc. v. Baker,* 757 S.W.2d 215, 216 (Ky.Ct.App.1988) (holding that a bonus based on employee output is included in wage); *Smith v. State of Louisiana, Dep't of Highways,* 370 So.2d 1295, 1296–98 (La.Ct.App.1979) (holding that a year-end bonus based on profitability of company is included in wage); *Lane Enters., Inc. v. Workmen's Comp. Appeal Bd.,* 537 Pa. 426, 644 A.2d 726, 728 (1994) (holding that an annual bonus based on yearly performance is included in wage). Others suggest that, because the average weekly wage calculation is an estimate of an employee's anticipated fu-

ture earnings in the absence of a work injury, the determination whether to include a bonus in the average weekly wage should hinge upon whether the bonus is part of the employee's "expected" or contractual compensation. *See, e.g., Simmonds v. Eastman Kodak Co.,* 781 P.2d 140, 142 (Colo.Ct.App.1989) (holding that an annual bonus is part of expected compensation); *Orlando v. Schiavo Bros., Inc.,* 10 Pa.Cmwlth. 86, 309 A.2d 84, 85–86 (1973) (holding that a bonus is not included in average weekly wage when no contractual term, express or implied, obligated employer to pay bonus).

10. In cases where the ordinary calculation methods cannot "reasonably and fairly be applied," the hearing officer may consider the earnings of similarly situated employees. 39–A M.R.S.A. § 102(4)(D) (Pamph.2000).

its first decree, when the employee was earning $437.26 a week as a bus driver prior to beginning vocational rehabilitation. Our review of a hearing officer's findings of fact are deferential. Section 318 provides, in pertinent part: "The hearing officer's decision, in the absence of fraud, on all questions of fact is final; but if the hearing officer expressly finds that any party has or has not sustained the party's burden of proof, that finding is considered a conclusion of law and is reviewable in accordance with section 322." 39–A M.R.S.A. § 318 (Pamph.2000). In its subsequent findings, the hearing officer found that even though McAdam had been earning $437.26 prior to beginning school, he "could not safely continue in his work as a school bus driver for the City of Portland ." Although the Board could have reached a different conclusion, there is evidence in the record to suggest that the school bus driving employment was becoming increasingly difficult, if not impossible for McAdam.

## B. Applicability of Varying Rates Compensation

[¶ 28] UPS also contends that the Board erred in its subsequent motion for findings of fact by awarding "varying rates" compensation, i.e., compensation based on the difference between pre-injury and actual post-injury wages. As UPS contends, because McAdam did not seek employment while he was enrolled in vocational rehabilitation, varying rates benefits would approximate 100% partial incapacity benefits.

[¶ 29] We recently held that the determination of the availability of post-injury employment must be based on the traditional criteria of an employee's physical capacity and qualifications, and not the employee's enrollment in vocational retraining. *Johnson v. Shaw's Distribution Ctr.*, 2000 ME 191, ¶¶ 14, 17, 760 A.2d 1057, 1061. Accordingly, we held that it was not error to treat full-time work in the employee's local community as available to a partially incapacitated employee, notwithstanding the employee's enrollment in Board-ordered vocational rehabilitation, as long as the employee is physically capable and otherwise qualified to obtain and perform that employment. *Id.*

[¶ 30] In this case, it is unclear from the hearing officer's subsequent findings of fact whether the determination that McAdam "could not safely continue in his work as a school bus driver for the City of Portland," is an explanation of the hearing officer's original finding that McAdam has a continuing capacity to earn $240 a week, or whether it constitutes a new determination that McAdam suffers a greater level of incapacity. Because the hearing officer's findings are unclear on this crucial point, we cannot determine whether the use of varying rates was based on McAdam's actual incapacity or his enrollment in the rehabilitation program. Thus, this issue must also be addressed on remand.

## V. MOTION TO COMPEL

[¶ 31] Finally, because the matter will be reheard on remand, we address UPS's contention that the hearing officer's denial of its motion to compel was in error. UPS sought medical treatment history and medical releases concerning a shoulder injury that McAdam may have suffered while playing professional hockey with the National and American Hockey Leagues. UPS was precluded from obtaining those records by McAdam's refusal to comply with the hearing officer's order and the hearing officer's refusal to enforce the order. The hearing officer concluded that "given unlimited time I wouldn't mind knowing what there is out there [concerning possible previous injuries], if anything, but I think in this forum, on this record, that the ruling [denying enforcement] is a correct one."

[¶ 32] The Board's rules entitle employers to obtain *relevant* written medical records concerning preexisting physical injuries without the necessity of first obtaining

a Board order.[11] The existence, nature, and extent of a prior injury to the same body part is relevant to determinations regarding "work-related injury," causation, and "significant contribution," all of which were in issue in this matter *See* 39–A M.R.S.A. § 201(4). Board rule, section 15 of chapter 12, titled "Exchange of Information," requires the employee to provide a limited release of information concerning prior injuries. *See* Me. W.C.B. Rule ch. 12, § 15.[12]

[¶ 33] Moreover, Board rule, chapter 12, section 18 provides for a "Limited Authorization for the Release of Certain Written Medical Information," and deals specifically with medical information related to preexisting conditions:

1. In the event that the employer contends that the medical records and information, pre-existing and subsequent to the workplace injury, for which claim is being made are relevant for determination of compensability and disability, it may obtain from the employee and *the employee is obliged to within a reasonable time to execute a limited authorization for focused written medical records only* employing the form set forth in Appendix III.

Me. W.C.B. Rule ch. 12, § 18 (emphasis added).

 [¶ 34] Although we give great deference to hearing officer's decisions in matters of discovery, the discretion granted by law and rule is not unlimited. We review such decisions for abuse of discretion, recognizing the greater opportunity for hearing officers to determine what matters are relevant and to control their dockets to reduce costs, redundancies, and unnecessary delays.[13]

[¶ 35] In the present case, UPS sought the release of relevant medical information pursuant to the Board rules. Although the hearing officer has discretion to limit discovery, and may decline to order discovery when the information sought is not relevant to the matters in issue, in light of the clear relevance of the information sought and the Board rules authorizing the employer to obtain that information, the hearing officer's subsequent decision to deny the employer's motion to compel discovery constituted an abuse of discretion.

The entry is:

Decision of the Workers' Compensation hearing officer vacated and remanded to the hearing officer for further proceedings consistent with this opinion.

---

11. Some exceptions exist regarding matters pertaining to previous psychological treatment, substance abuse, or sexually transmitted diseases. Me. W.C.B. Rule ch. 12, § 18.

12. Under this rule, the employee is required to answer the questions in Appendix II, including the following question:

5. Tell whether you ever injured the same body part before you injured it at work. Tell whether you suffered any earlier injuries to any other parts of the body that have affected the part of your body that you injured at work. Tell whether you had any other medical conditions before you were injured at work.

If you have suffered any earlier injuries, or have any pre-existing medical conditions, you must write down when and how each earlier injured [sic] happened and the names and addresses of doctors and hospitals and any other health care providers that you saw because of that earlier injury or because of the earlier medical condition. You must put down when the injury happened and how long you were treated for it. WCB Form, ch. 12, Appendix II.

13. Pursuant to 39–A M.R.S.A. § 309(2) (Pamph.2000), the Board is not bound by the rules of evidence, and the Board "may exclude irrelevant or unduly repetitious evidence."