2008 ME 81

Leanne **FERNALD**

v.

**SHAW'S SUPERMARKETS, INC.**

and

**William J. Babine**

v.

**Bath Iron Works.**

Supreme Judicial Court of Maine.

Argued:  Sept. 12, 2007.

Reargued:  Feb. 14, 2008.

Decided:  May 8, 2008.

John H. King, Esq., William O. LaCasse, Esq., James D. Poliquiri, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, ME, for Shaw's Supermarkets, Inc. and Bath Iron Works Corporation.

Jennifer S. Higgle, Esq. (orally), Germani & Riggle, LLC, Portland, ME, for Central Maine Orthopaedics.

Steven L. Johnson, Esq. (orally), Kozak & Gayer, PA, Augusta, ME, for Maine Hospital Association.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.*

Majority: LEVY, SILVER, MEAD, and GORMAN, JJ.

Dissent: SAUFLEY, C.J., and CLIFFORD, and ALEXANDER, JJ.

MEAD, J.

[¶1] In these consolidated cases, the employers, Shaw's Supermarkets and Bath Iron Works, appeal from decisions of a Workers' Compensation Board hearing officer (*Goodnough, HO*) granting Central Maine Orthopedics' (CMO) petitions for payment of medical and related services. The hearing officer determined that amounts charged by CMO for the services provided to the injured employees constitute CMO's "usual and customary charges" pursuant to 39–A M.R.S. § 209(2) (2007). The employers contend that because the Workers' Compensation Board has not promulgated a fee schedule for facility charges pursuant to 39–A M.R.S. § 209(1) (2007), the hearing officer erred in requiring them to pay without allowing them to inquire into the amounts CMO charges to private third-party payors for the same services, or to otherwise challenge the reasonableness of the charges.[1] We affirm the hearing officer's decisions.

## I. FACTS AND PROCEDURE

### A. *Fernald v. Shaw's Supermarkets*

[¶2] Leanne Fernald sustained a right shoulder injury on August 23, 2001, while working for Shaw's Supermarkets. She

---

* Although not present at the September 12, 2007, oral argument, Justice Gorman participated in the February 14, 2008, oral argument and the development of this opinion.

1. The Workers' Compensation Board has not established maximum charges for medical fa-

cility charges. Unless the maximum charges are promulgated, employers and insurers who have not negotiated discounted rates for services will continue to be denied the fee alternatives provided by 39–A M.R.S. § 209(2) (2007).

underwent rotator cuff surgery on March 24, 2004. The surgery was performed by an orthopedic surgeon at CMO, an ambulatory surgical center. There is no dispute that the injury is compensable and that the surgery constituted reasonable and necessary treatment. Shaw's, which self-insures, paid the physician's charges associated with the surgery without dispute. CMO also charged $4989.25 in facility charges. This amount is CMO's generally applicable charge for that surgery; it is published and available to the public for inspection in the price list that CMO is required by statute to maintain for the most common outpatient procedures. *See* 22 M.R.S. § 1718 (2007); 22 M.R.S. § 8709(1) (2007).

[¶ 3] Shaw's contended that this charge was unreasonable. It paid the undisputed portion, $2645.16, leaving an unpaid balance of $2344.09. CMO filed a petition for payment of medical and related services. Shaw's designated an expert witness who would have testified, based on amounts actually paid by other payors and market rates, that CMO's facility charges were excessive. CMO filed a motion to strike that evidence, which the hearing officer granted. Shaw's also sought, through discovery, to inquire into the amounts that CMO receives from private third-party insurers such as Anthem Blue Cross for the same services that CMO provided to Fernald. CMO objected, and Shaw's filed a motion to compel, which the hearing officer denied. At the hearing, CMO stipulated that there are payors who, pursuant to negotiated agreements and based on a variety of factors, may pay less than the amount charged. The hearing officer ultimately granted CMO's petition for payment of medical and related services, and ordered Shaw's to pay the balance. Shaw's filed a motion for findings of fact and conclusions of law, which the hearing officer denied.

## B. *Babine v. Bath Iron Works*

[¶ 4] William Babine sustained an injury to his shoulders on April 8, 2005, while working for BIW. He underwent right shoulder surgery on June 9, 2005. The surgery was performed by an orthopedic surgeon at CMO. There is no dispute that the injury is compensable and that the surgery constituted reasonable and necessary treatment. CMO billed BIW $6498.63. This amount represents CMO's standard charge for the services provided. BIW disputed this amount, contending that it is excessive. BIW paid CMO the undisputed portion, $3156.83, leaving an unpaid balance of $3341.80. BIW filed a motion to permit discovery, in which it sought records of what CMO is paid by private third-party payors for the treatment in issue, and a motion in limine, in which it sought a ruling on whether it could introduce evidence, including expert testimony, regarding the average cost of that treatment. CMO objected on the ground that the information sought is irrelevant and that it constitutes confidential and proprietary business information. The hearing officer denied both motions. Based on stipulated facts, the hearing officer ultimately granted CMO's petition for payment. The hearing officer denied BIW's motion for additional findings of fact and conclusions of law.

## C. Board Review

[¶ 5] Both decisions were referred by the hearing officer to the full Workers' Compensation Board for review pursuant to 39–A M.R.S. § 320 (2007), and were consolidated. After the Board held a hearing, it failed to reach a majority vote; thus, "the decision of the hearing officer stands" and we treat the appeal as if made directly from the hearing officer's decision. *Id.* Both employers sought appellate re-

view, which we granted. The Maine Hospital Association has filed a brief as amicus curiae.

## II. DISCUSSION

[¶ 6] The employers contend that in the absence of a Board-promulgated fee schedule for facility charges, 39–A M.R.S. § 209 (2007) authorizes them to challenge the provider's assertion of what is the "usual and customary charge" through discovery of the provider's records or through expert testimony. They argue, pursuant to section 209(3), that the "usual and customary charge" should not exceed what the provider accepts from private third-party payors for the same services. CMO contends that the hearing officer correctly interpreted "usual and customary charge" to mean the amount that it publishes as its standard charge for a procedure, not what it actually receives from third-party payors as a result of a confidential negotiation process.

### A. Standard of Review

■■■■ [¶ 7] Our standard of review of a hearing officer decision interpreting a provision of the Workers' Compensation Act is as follows:

Our purpose in construing a statute is to give effect to the legislative intent. In determining the legislative intent, we look first to the plain meaning of the statutory language, and we construe

that language to avoid absurd, illogical or inconsistent results. In addition to examining the plain language, we also consider the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved. If the statutory language is ambiguous, we then look beyond the plain meaning and examine other indicia of legislative intent, including its legislative history. We have noted that decisions of the Board interpreting the Workers' Compensation Act are entitled to great deference and will be upheld on appeal unless the statute plainly compels a different result.

*Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me.1994) (citations and quotation marks omitted). We review hearing officer decisions on discovery matters for abuse of discretion. *McAdam v. United Parcel Serv.*, 2001 ME 4, ¶ 34, 763 A.2d 1173, 1182.

### B. Applicable Statutes and Regulations

[¶ 8] Pursuant to section 209 of the Workers' Compensation Act, for services rendered to an injured employee, "[a] health facility or health care provider must be paid either its usual and customary charge for any health care services or the maximum charge established under the rules adopted [by the Board], whichever is less." 39–A M.R.S. § 209(2).[2]

---

2. Title 39–A M.R.S. § 209 (2007) provides in relevant part:

§ 209. Medical fees; reimbursement levels

1. Standards, schedules or scales. In order to ensure appropriate limitations on the cost of health care services, the board shall adopt rules that establish:

A. Standards, schedules or scales of maximum charges for individual services, procedures or courses of treatment. In establishing these standards, schedules or

scales, the board shall consider maximum charges paid by private 3rd-party payors for similar services provided by health care providers in the State and shall consult with organizations representing health care providers and other appropriate groups. The standards must be adjusted annually to reflect any appropriate changes in levels of reimbursement. The standards apply to hospital costs and health care providers and must be in effect no later than January 1, 1993; and

[¶9] Section 209 also provides that health care providers "may not charge more for the services or courses of treatment for employees than is charged to private 3rd-party payors for similar services or courses of treatment." 39–A M.R.S. § 209(3). Section 209(3) authorizes the use of a utilization review process pursuant to 39–A M.R.S. § 210(7), (8) (2007),[3] or the appointment of an independent medical examiner pursuant to 39–A M.R.S. § 312 (2007), to evaluate whether charges are excessive. Neither was employed in this case.[4]

[¶10] The statute requires the employer to pay for the medical services promptly, "if the costs are necessary and adequate and the charges reasonable." 39–A M.R.S. § 206(7) (2007).[5] If the insurer or the employer disputes the amount charged, the employer or insurer may, after investigation, adjust the amount of the bill, but must also notify the health care

---

B. Fees for the preparation of materials, including reports of treatment required in section 208, subsection 2, or attendance at depositions or hearings as may be required under this Act.

2. **Payment for services.** A health facility or health care provider must be paid either its usual and customary charge for any health care services or the maximum charge established under the rules adopted pursuant to subsection 1, whichever is less.

3. **Limitation on reimbursement.** In order to qualify for reimbursement for health care services provided to employees under this Title, health care providers providing individual health care services and courses of treatment may not charge more for the services or courses of treatment for employees than is charged to private 3rd-party payors for similar services or courses of treatment. An employer is not responsible for charges that are determined to be excessive or treatment determined to be inappropriate by an independent medical examiner appointed pursuant to section 312 or by the insurance carrier, self-insurer or group self-insurer pursuant to section 210, subsection 7 or the board pursuant to section 210, subsection 8.

3. Title 39–A M.R.S. § 210(7), (8) (2007) provides:

7. **Excessive charges, unjustified treatment.** If an insurance carrier, self-insurer or group self-insurer determines that a health facility or health care provider has made any excessive charges or required unjustified treatment, hospitalization or visits, the health facility or health care provider may not receive payment under this chapter from the insurance carrier, self-insurer or group self-insurer for the excessive fees or unjustified treatment, hospitalization or vis-its, and is liable to return to the insurance carrier any such fees or charges already collected. The board may review the records and medical bills of any health facility or health care provider with regard to a claim that an insurance carrier, self-insurer or group self-insurer has determined is not in compliance with the schedule of charges or requires unjustified treatment, hospitalization or office visits.

8. **Inappropriate services.** If an insurance carrier determines that a health facility or health care provider improperly over-utilized or otherwise rendered or ordered inappropriate health care or health services, or that the cost of the care or services was inappropriate, the health facility or health care provider may appeal to the board regarding that determination pursuant to procedures provided for under the system of utilization review.

4. At oral argument, the parties asserted that a utilization review or an IME opinion would ordinarily be obtained only on the issue of appropriate treatment, not excessive charges. We express no opinion with respect to that issue.

5. Title 39–A M.R.S. § 206(7) (2007) provides, in pertinent part:

7. **Employer and employee duties.** When any services are procured or aids are required by the employee, it is the employee's duty to see that the employer is given prompt notice of that procurement or requirement. The employer shall then make prompt payment for them to the provider or supplier or reimburse the employee ... if the costs are necessary and adequate and the charges reasonable.

provider from whom the bill originated in writing that the requested fee has been adjusted and must provide an explanation for such adjustment. Me. W.C.B. Rule, ch. 5, § 9(3). The uncontested portion of the fee must be paid at that time. *Id.*

[¶ 11] The Board's rules also provide a mechanism for the health care provider to challenge the denial or adjustment of their charges. If the health care provider disputes a partial or denied payment, it is entitled to file a petition to fix the amount to be allowed with the Workers' Compensation Board "for determination of any issue regarding medical services and/or medical billing." *Id.* § 9(4). This is the procedure followed by the employers and providers in these cases.

[¶ 12] Section 209 also requires the Board, "[i]n order to ensure appropriate limitations on the cost of health care services," to adopt rules that establish "[s]tandards, schedules or scales of maximum charges for individual services, procedures or courses of treatment." 39-A M.R.S. § 209(1). When establishing these standards, schedules or scales, the Board is required to "consider maximum charges paid by private 3rd-party payors for similar services provided by health care providers in the State and shall consult with organizations representing health care providers and other appropriate groups." *Id.*

[¶ 13] The Board has established a fee schedule of maximum charges for surgical procedures; however, it applies only to professional services. Me. W.C.B. Rule, ch. 5, § 3.[6] The rule expressly does not apply to facility charges. Rule ch. 5, § 3 further requires that charges be discounted for timely payment: "Reimbursement for services provided to an injured worker who is an outpatient at a surgical center shall be discounted at 5% based on payments received within 30 days of the original billing date. Full rates will apply when payment is not made within the 30 day period." *Id.*

[¶ 14] Because the Board has not, to date, established maximum charges or a fee schedule for facilities such as CMO, health care facilities are entitled to be paid to the extent of their usual and customary charges, with a discount for timely payment. 39-A M.R.S. § 209(2); Me. W.C.B. Rule, ch. 5, § 3. At issue are (1) the meaning of the term "usual and customary charge" in section 209(2), which is not specifically defined in the Act; and (2) whether section 209(3) limits what a provider may charge injured employees to what the provider receives from private third-party payors, or at least authorizes employers to challenge the asserted usual and customary charge with evidence of what the provider pays to other private, third-party payors or with expert testimony.

### C. Provider Charges

[¶ 15] We have not previously had occasion to construe the term "usual and customary charge" in section 209(2), or to examine the limits placed on providers as to what they are permitted to charge in section 209(3). At the heart of the parties' dispute is a fundamental tenet of workers' compensation law: employees, employers, and insurers must not be subjected to excessive charges for medical treatment. *See* 39-A M.R.S. §§ 210(7), (8), 209(3). As a corollary to this rule, and because the Board has not promulgated rules establishing maximum charges for outpatient facilities, section 209(2) plainly provides

---

**6.** Me. W.C.B. Rule ch. 5, § 3 provides: "The Workers' Compensation medical fee schedule for surgical procedures was intended to cover the professional component of those services only. It is not intended to cover the facility charges for those same services."

that medical care providers are entitled to be compensated for any non-excessive, "usual and customary" charges for "reasonable and proper" treatment.[7] 39–A M.R.S. §§ 206, 209(2) (2007).

[¶ 16] CMO stipulated that it accepts discounted payments from some organizations and entities for particular services. Organizations that refer a high volume of patients to health care providers, such as large insurance carriers, are in a position to negotiate reimbursement rates that are lower than the provider's usual and customary charges for specific services. Similarly, government programs that underwrite health care costs may benefit from legislated rates that are well below the provider's published charges. The practice of allowing favorable discounts to such organizations and entities is not unique to the medical care industry. Similar favored-status relationships occur frequently in a free market economy.

[¶ 17] The employers in this case argue that "usual and customary charge" in section 209(2) means a price akin to what a medical provider has negotiated with private third-party payors for the same service, and that section 209(3) mandates that they not be charged in excess of this rate. CMO argues that the reference to "charge[s]" in section 209(3) applies only to what it bills to a typical consumer, not the discounted payment that it agrees to accept from entities with whom it has negotiated discounts. Since it *charges* the same rate to everyone, it argues, the statute is satisfied even though it accepts less from some organizations and entities.

■ [¶ 18] Although the employers here characterize CMO's argument as disingenuous, the statutory language plainly supports CMO's position. Section 209(2) describes how a provider is to be *paid*. The use of the phrase "must be paid" leaves no room for interpretation. It establishes only two possible bases for payment: (1) the maximum fee as established by rule (which has no application at present as a maximum fee schedule has not been promulgated), or (2) the provider's usual and customary charge.

[¶ 19] By contrast, section 209(3) states that providers may not charge more for medical services than is charged to private third-party payors for similar services. The employers' argument that this section establishes a *payment* ceiling tied to discounted rates would render sections 209(1) and 209(2) superfluous. They would have utterly no meaning or purpose if the interpretation of section 209(3) advocated by the employers and the dissent is adopted. When applying the plain language approach to statutory interpretation, if one of two interpretations results in conflict with other provisions within the same section and one does not, the interpretation resulting in a harmonious result is favored.[8] *See FPL Energy Maine Hydro LLC v. Dep't of Envtl. Prot.*, 2007 ME 97, ¶ 12, 926 A.2d 1197, 1201 (stating statutory interpretation requires that we "consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result

7. At oral argument, counsel for the employers downplayed the argument that section 209(3) requires that workers' compensation insurers be charged the lowest discounted charges that are received from certain third-party payors for particular services.

8. If section 209(3) simply allows employers and insurers to pay the lowest discounted rates, the fee schedule as anticipated in section 209(1) would be pointless. The Workers Compensation Board could simply dispense with the laborious fee schedule promulgation as the employers and insurers would understandably opt for the lowest discounted rate in each instance.

... may be achieved" (quotation marks omitted)). If the Legislature sought to authorize payments at the discounted rates, it could have enacted a statute that plainly states: "Providers may not charge more for the services or courses of treatment for the employee *than they accept as payment from* private third-party payors for the same services or courses of treatment."

[¶ 20] Thus, the plain language of sections 209(2) and (3) does not support the employers' arguments. Instead, it suggests a Legislative intent to prevent providers from charging elevated rates for services on workers' compensation matters that exceed the provider's usual and customary rates. This interpretation is supported by the inclusion of the last sentence of section 209(3), which provides two mechanisms for contesting excessive charges. If the Legislature had already mandated that providers charge the discounted, negotiated rates for treatment of employment-related injuries, the provisions in section 209(3) to contest excessive charges would be rendered surplusage to a large degree. In addition, the 5% discount for prompt payment provided for in Rule ch. 5, § 3, suggests that the Board did not contemplate that providers would be required to charge the third-party payor rates. It would be inconsistent to require a further discount if the mandated charges were already discounted. Finally, the mandate in section 209(1) that the Workers' Compensation Board consider the

rates *paid* by third-party payors in establishing the fee schedule confirms that the Legislature did not intend to establish elsewhere in the same statute that providers were required to charge the discounted rates accepted from private third-party payors.[9] It also suggests that the Legislature knowingly distinguished the words "paid" and "charges" within the subsections of section 209. We therefore decline to construe section 209(3) to require that providers accept payments from employers and workers' compensation insurers in the amounts they accept from private third-party payors as full payment for the same services.[10]

### D. "Usual and Customary Charges"

[¶ 21] The question remains: In discerning the meaning of "usual and customary charge for any health care services" as used in section 209(2), does the amount that the provider asserts as its usual and customary charge govern when that amount matches the amount in the price list that is generated pursuant to 22 M.R.S. § 1718, and the evidence indicates that this is the price that the provider states on its bills to all entities for that service? Or must the usual and customary charge be determined on a case-by-case basis by a hearing officer upon consideration of evidence, adduced by expert testimony or developed through discovery, of either the market rate or the amount that

9. Unless stringent non-disclosure orders were imposed in every matter, the health care providers' highly sensitive and proprietary information regarding discounted rates would become matters of public record. The Legislature has elsewhere indicated that providers are entitled to keep this information confidential. *See* 22 M.R.S. § 8707(4) (2007) (directing the Maine Health Data Organization to treat as confidential information provided to it by health care providers, including "information regarding discounts off charges, including capitation and other similar agreements, negotiated between a payor or purchaser and a provider of health care").

10. The dissent invokes the plain language doctrine in support of its conclusions but does not address the fact that its interpretation renders other clear provisions of the same statute superfluous and meaningless.

provider accepts as payment from private third-party payors for the same service?

[¶ 22] Although the medical profession is a highly regulated industry, medical care providers are still entitled to establish their own rates for services. As noted above, providers' charges for many medical services must be published and made available so that prospective consumers can make reasoned choices in determining where to seek treatment. *See* 22 M.R.S. § 1718. Thus, facilities have a market-based incentive to set prices that will not encourage patients, upon reviewing their price list, to seek care elsewhere. There is no inherent unfairness in the manner in which the published price is established.

[¶ 23] In addition, section 209(1) directs the Workers' Compensation Board to consider third-party, discounted rates when establishing "standards, schedules or scales of maximum charges for individual services." It is apparent from the plain language of section 209(1) that, to the extent that the Legislature intended that such standards, schedules or scales be set, it intended that they be set by the Board. It is unlikely that the Legislature intended, even in the absence of a Board-promulgated fee schedule, that the rate-setting process would be repeated by a hearing officer in every claim.

[¶ 24] Case-by-case determinations of the usual and customary charge would defeat the purpose of Board rules promulgated to "ensure the speedy, efficient, just and inexpensive disposition of all proceedings under this Act." 39-A M.R.S. § 152(2) (2007). If the employers' position were adopted, counsel for carriers and employers would be remiss if they failed to fully explore this issue in every case before recommending payment.[11] The hearing officer would be required to review and distill the data before announcing a particular figure. The objectives of simplifying and streamlining the workers' compensation claim process would be defeated by an interpretation of the statute that would dramatically increase litigation in this area.

[¶ 25] We therefore conclude that the hearing officer's decision, that the charge on the price list for the medical service that is maintained by the provider pursuant to 22 M.R.S. § 1718 constitutes conclusive proof of CMO's usual and customary charge pursuant to 39-A M.R.S. § 209(2), and that amounts negotiated as payment for services by private third-party payors are relevant only in the rate making process pursuant to section 209(1)(A), comports with the Workers' Compensation Act, and no contrary interpretation is compelled. We further conclude that the hearing officer acted within his discretion when limiting discovery on the issue and by excluding the proffered expert testimony.

The entry is:

The decisions of the Workers' Compensation Board hearing officer denying the employers' motions in limine or to compel discovery and granting the provider's petitions for payment of medical and related services or to fix are affirmed.

CLIFFORD, J., with whom SAUFLEY, C.J. and ALEXANDER, J., join, dissenting.

[¶ 26] In enacting the 1992 reform of the Workers' Compensation Act, the Legislature expressed its intention to limit overall costs to the workers' compensation

---

11. This ad hoc procedure raises the very likely scenario where different hearing officers might arrive at notably different figures for usual and customary charges for the same services by the same providers. This is likely why the Legislature has rejected this approach and opted for maximum charges to be established pursuant to section 209(1).

system, including the cost of health care. Contrary to that intent, the Court, relying on 39–A M.R.S. § 209(2) (2007), concludes that employers and insurers may not challenge amounts charged by medical facilities for outpatient surgical services provided to employees as long as the amount charged equals the published rate that the facility lists as its initial charge to all payors. In so doing, the Court ignores provisions of the Act and Board rules that limit what health care facilities are permitted to charge for services to injured employees, and that expressly permit—and even require—insurers and employers to challenge excessive or unreasonable charges. The Court's decision allows health care facilities to dictate what employers must pay, even if those payments are well in excess of what other private third-party payors pay for the same services. Accordingly, I respectfully dissent.

## I. DISCUSSION

[¶ 27] Section 209(2)[12] provides that a health care facility "must be paid either its usual and customary charge for any health care services or the maximum charge established" by rules adopted by the Board pursuant to section 209(1). The Board, however, has not promulgated rules establishing maximum charges applicable to facilities for outpatient surgical procedures. In the absence of rules promulgated by the Board, we are asked to decide whether workers' compensation insurers and employers are entitled to challenge the amount billed to them by outpatient surgical facilities on the ground that the charges are not the facility's "usual and customary charges" or that the charges are unreasonable. I would conclude that the employers and insurers are entitled to challenge those charges.

[¶ 28] The hearing officer determined that (1) "usual and customary charge" means the rate, published pursuant to 22 M.R.S. § 1718 (2007),[13] that the provider charges as an initial matter to all payors, and (2) employers and insurers are prohib-

---

12. Title 39–A M.R.S. § 209 (2007) provides in relevant part:

    **1. Standard, schedules or scales.** In order to ensure appropriate limitations on the cost of health care services, the board shall adopt rules that establish:

    A. Standards, schedules or scales of maximum charges for individual services, procedures or courses of treatment. In establishing these standards, schedules or scales, the board shall consider maximum charges paid by private 3rd-party payors for similar services provided by health care providers in the State and shall consult with organizations representing health care providers and other appropriate groups.

    . . . .

    **2. Payment for services.** A health facility or health care provider must be paid either its usual and customary charge for any health care services or the maximum charge established under the rules adopted pursuant to subsection 1, whichever is less.

    **3. Limitation on reimbursement.** *In order to qualify for reimbursement for health care services provided to employees under this Title, health care providers providing individual health care services and courses of treatment may not charge more for the services or courses of treatment for employees than is charged to private 3rd-party payors for similar services or courses of treatment.* An employer is not responsible for charges that are determined to be excessive or treatment determined to be inappropriate by an independent medical examiner appointed pursuant to section 312 or by the insurance carrier, self-insurer or group self-insurer pursuant to section 210, subsection 7 or the board pursuant to section 210, subsection 8.

(Emphasis added.)

13. Title 22 M.R.S. § 1718 (2007) provides, in relevant part:

    **§ 1718. Consumer information**

    Each hospital or ambulatory surgical center licensed under chapter 405 shall maintain a price list of the most common inpatient services and outpatient procedures provided by the licensee.

ited from challenging that rate with contrary evidence developed either through discovery of what private third-party payors are asked to pay or by expert testimony regarding the market rate. The Court affirms that ruling.

[¶ 29] I agree with the Court that pursuant to section 209(2), in the absence of a Board-promulgated fee schedule, the employer is obligated to pay the "usual and customary charge." I disagree, however, as to the meaning of that term, and that section 209(2) prohibits employers from presenting evidence of what other entities are being charged for the same service. In construing section 209(2), I would give effect to the intent of the Legislature.

In determining the legislative intent, we look first to the plain meaning of the statutory language, and we construe that language to avoid absurd, illogical or inconsistent results. In addition to examining the plain language, we also consider the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved. If the statutory language is ambiguous, we then look beyond the plain meaning and examine other indicia of legislative intent, including its legislative history.

*Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me.1994) (citations and quotation marks omitted).

. . . .

**2. Outpatient nonemergent procedures.** For outpatient nonemergent procedures for which an individual would not incur a bed charge, the price list must include average charges for the 20 most common surgical and diagnostic procedures, excluding laboratory services.

. . . .

**3. Emergency services.**

. . . .

## A. Plain Meaning

[¶ 30] At issue is the meaning of the words "usual and customary charge" in section 209(2). The Court concludes that the word "charge" means the amount that the facility bills to all patients, which is the amount on the price list for the medical service that is maintained by the provider pursuant to 22 M.R.S. § 1718. Since the facilities "charge" the same rate to all customers, the Court concludes that the "statute is satisfied," i.e., that the published charge is the usual and customary charge, even though the facility accepts less as payment in full for the same service from some private third-party payors. I disagree for two reasons.

[¶ 31] First, nowhere in the Workers' Compensation Act is "usual and customary charge" defined with reference to Title 22.

[¶ 32] Second, while the word "charge" has many meanings, in this context it plainly means "the price demanded for a thing or service" or "to fix or ask (a sum) as a fee or payment." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 377 (3d ed.2002). Just because a provider writes an amount on a bill does not mean that amount is the "charge" if the provider is not demanding that amount in payment for the service, and in fact has separately agreed to accept a lower price. Moreover, if only a small minority of patients are expected to pay the amount on the bill,

The hospital or ambulatory surgical center licensed under chapter 405 shall post in a conspicuous place a statement about the availability of the price list as required by this section. Posting of the price list is not required.

The hospital or ambulatory surgical center licensed under chapter 405 shall provide its price list upon request of a consumer.

The price list may include a statement that actual charges may vary depending on individual need and other factors.

certainly it cannot be fairly characterized as the usual and customary charge.

## B. Whole Statutory Scheme

[¶ 33] An examination of the whole statutory scheme of which section 209(2) forms a part indicates that the Legislature intended that amounts charged to private third-party payors be considered when determining the limitations on what may be charged to workers' compensation insurers and employers.

[¶ 34] Section 209(1) requires that the Board adopt rules that establish "standards, schedules, or scales of maximum charges" for health care services for the express purpose of ensuring "appropriate limitations on the cost of health care services" to the Workers' Compensation System. In so doing, the Legislature mandated that the Board consider "maximum charges paid by private 3rd-party payors for similar services provided by health care providers in the State." *Id.* This provision indicates that the Legislature considered the amounts paid by private third-party payors as relevant in determining what the maximum charge for medical services should be.

[¶ 35] The Court concludes that section 209(1) indicates that amounts paid by private third-party payors are relevant only in the rulemaking process and are not relevant to determining whether a charge is excessive on a case-by-case basis. The rulemaking process has not occurred, however, and to require employers and workers' compensation insurers to pay the amount unilaterally determined by the facilities without that amount being compared to and limited by what other private insurers are paying contravenes the intent of the Legislature.

[¶ 36] Section 209(3), expressly subtitled "[l]imitations on reimbursement," also demonstrates that amounts paid for the same service by private third-party payors are relevant to an inquiry regarding "usual and customary charge." It provides that

> [i]n order to qualify for reimbursement for health care services provided to employees under this Title, health care providers providing individual health care services and courses of treatment *may not charge more for the services or courses of treatment for employees than is charged to private 3rd-party payors for similar services or courses of treatment.*

(Emphasis added.) This provision indicates that the Legislature intended that (1) limitations be placed on the amount that providers can be reimbursed for health care services provided to injured employees, and (2) those limitations are defined by the amounts that private third-party payors pay for the same services. Limiting the meaning of "charge" in section 209(3) to the amount on a bill the provider sends to all payors, instead of the amount that the provider has agreed to accept as payment in full from some of those payors, makes little sense if that bill does not reflect the amount that the provider is in fact demanding in payment. The Court's definition of the word "charge" renders the intended limitations placed on what providers can be reimbursed meaningless.

[¶ 37] When read together, subsections 209(1), (2), and (3), demonstrate that the amount demanded as payment from private third-party payors for the same service is highly relevant to an inquiry regarding what the usual and customary charge is for that service. Other statutes and Board rules support the conclusion that employers should be entitled to challenge the facility's asserted charge.

[¶ 38] Title 39–A M.R.S. § 206(7) (2007) requires employers to make prompt payment for medical services provided to

the employee, only "if *the costs are necessary and adequate and the charges reasonable.*" (Emphasis added.) Requiring employers to accept the published charge denies the employer/insurer the right to challenge the reasonableness of the charge for the medical services, and allows health care providers to *unilaterally* determine what the workers' compensation system is required to pay for those medical services.

[¶ 39] Me. W.C.B. Rule, ch. 5, § 9(3) states that "the insurer *shall* undertake reasonable investigations to ascertain whether a service is subject to the maximum allowable payment." Moreover, if employers/insurers dispute the amounts charged, Board rules allow them to adjust the amount of the bill and notify the health care provider that the requested fee has been adjusted and provide an explanation for the adjustment, subject to a petition to fix. *Id.*

[¶ 40] Not only can the insurer adjust the payment, the insurer/employer may under certain circumstances be entitled to challenge the charges pursuant to a medical utilization review process. 39–AM.R.S. § 210(2007). Section 210 allows an insurance carrier, self-insured employer or group self-insurer to evaluate the appropriateness of health care services provided to an injured employee, based on medically accepted standards. 39–A M.R.S. § 210(2).[14] If it is determined that "a health facility or health care provider has made any excessive charges or required unjustified treatment, hospitalization or visits, the health facility or health care provider may not receive payment ...

from the insurance carrier, self-insurer or group self-insurer for the excessive fees or unjustified treatment...." 39–A M.R.S. § 210(7). The Board has promulgated rules governing the utilization review process. Me. W.C.B. Rule, ch. 7. While the utilization review process was not used in this case, it indicates that the Legislature intended that medical providers be subject to certain limitations, and that they are not free to impose charges on employers and insurers that are excessive or receive payment for unnecessary medical procedures.

### C. Legislative History

[¶ 41] Section 209 was passed as part of the 1992 reform of the Workers Compensation Act. That reform effort was intended to reduce workers' compensation costs to employers and attract employers to the state, as well as cut costs to the system as a whole. 7 Legis. Rec. S–40–43 (3rd Spec.Sess.1992); 7 Legis. Rec. H–50–52, 76–81, 91–100 (3rd Spec.Sess.1992); Blue Ribbon Commission to Examine Alternatives to the Workers' Compensation System and to Make Recommendations Concerning Replacement of the Present System, Report of the Blue Ribbon Commission (Aug. 31, 1992); P.L.1991, ch. 885, Emergency Preamble (adopting recommendations of the Blue Ribbon Commission); *see also Temm v. S.D. Warren Co.,* 2005 ME 118, ¶ 13, 887 A.2d 39, 43 (stating overall purpose of the workers' compensation reform of 1992 was to reduce costs on the workers' compensation system).

---

**14.** Title 39–A M.R.S. § 210(2) (2007) provides:

**2. Utilization review.** For purposes of this section, "utilization review" means the initial prospective, concurrent or retrospective evaluation by an insurance carrier, self-insurer or group self-insurer of the appropriateness in terms of both the level and the quality of health care and health services provided an injured employee, based on medically accepted standards. Utilization review requires the acquisition of necessary records, medical bills and other information concerning any health care or health services.

[¶ 42] For the Court to allow the health care providers to charge more for services rendered to employees for workplace injuries for which employers are responsible under the workers' compensation system than they charge to other payors, and to unilaterally determine what the workers' compensation system is required to pay for medical services, is contrary to the overall purpose of the workers' compensation reform of 1992, to specific provisions of sections 209 and 206, and to the rules promulgated by the Board that allow insurers and employers to challenge excessive charges.

[¶ 43] Accordingly, I would vacate the decision of the hearing officer granting CMO's petitions for payment of medical and related services in these cases, and I would remand to allow discovery regarding what constitutes the usual and customary charge for the medical services in issue, including amounts paid by private third-party payors for the same services, and for a hearing at which the issue of whether the amounts charged constitute the "usual and customary charge" or a reasonable charge for the services provided.